**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 5, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

LEGRAND P. BELNAP, M.D.,

     Plaintiff - Appellee,

v.

IASIS HEALTHCARE, a Delaware corporation; SALT LAKE REGIONAL MEDICAL CENTER, L.P., a Delaware limited partnership, d/b/a Salt Lake Regional Medical Center; BEN HOWARD, M.D.; ALAN DAVIS, M.D.; ANGELO CHACHAS, M.D.; WANDA UPDIKE, M.D.; KATHY OLESON,

    Defendants - Appellants.

No. 15-4010

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:14-CV-00086-DN)**

Juliette P. White of Parsons Behle & Latimer, Salt Lake City, Utah (Francis M. Wikstrom and Alan S. Mouritsen of Parsons Behle & Latimer, Salt Lake City, Utah, with her on the briefs), for Defendants-Appellants.

Peter Stirba of Stirba, P.C., Salt Lake City, Utah (Julia D. Kyte and Jeffrey D. Mann of Stirba, P.C., Salt Lake City, Utah, with him on the brief), for Plaintiff-Appellee.

Before **KELLY**, **BALDOCK**, and **HOLMES**, Circuit Judges.

**HOLMES**, Circuit Judge.

LeGrand P. Belnap, M.D., is a surgeon at the Salt Lake Regional Medical Center ("SLRMC"). Dr. Belnap and SLRMC entered into a Management Services Agreement ("Agreement") under which he would provide consulting services to help SLRMC develop a new surgical center. The Agreement contained an arbitration provision, including an agreement to arbitrate questions of arbitrability. SLRMC subsequently disciplined Dr. Belnap for alleged misconduct and then reversed course and vacated the discipline. As a result, Dr. Belnap brought various claims against SLRMC, its alleged parent company, and several of its individual employees. These Defendants moved to compel arbitration on the basis of the arbitration provision in the Agreement. The district court determined that most of the claims fell outside the scope of the Agreement, and granted in part and denied in part the motion. Exercising jurisdiction under the Federal Arbitration Act ("FAA"), 9 U.S.C. § 16(a)(1)(A) and (C), we **AFFIRM IN PART**, **REVERSE IN PART**, and **REMAND** for further proceedings.

**I**

**A**

Dr. Belnap is a general surgeon. In 2009, he joined the staff of the Salt Lake City hospital, SLRMC. Dr. Belnap was appointed Surgical Director of SLRMC's intensive-care unit.

As an SLRMC staff member, Dr. Belnap's relationship with the hospital is governed by the SLRMC Bylaws of the Medical and Dental Staff ("Bylaws"). In

2

addition to governing the treatment and care of patients, the Bylaws provide rules for investigating a physician, implementing a suspension, and guaranteeing due process through fair hearing procedures. The Bylaws do not contain an arbitration provision.

On February 1, 2012, Dr. Belnap entered into the Agreement with SLRMC. It related to the development of a "Hepatic Surgical department devoted to a[n] Abdominal Treatment Program," called the "Center." Aplts.' App. at 54. Specifically, the Agreement engaged Dr. Belnap's "management and consulting services" to develop and operate the Center. *Id.* at 55.[1] With respect to those services, the Agreement created an "independent contractor" relationship between Dr. Belnap and SLRMC. *Id.* at 65 (§ 5.1).

In the Agreement, Dr. Belnap represented that he:

> (i) holds a license to practice medicine in the State of Utah, and neither that license nor any license to practice medicine in any other jurisdiction has ever been denied, suspended, revoked, terminated, voluntarily relinquished under threat of disciplinary action, or restricted in any way; (ii) maintains an active surgery practice; (iii) holds medical staff privileges at [SLRMC]; [and] (iv) has not had medical staff privileges denied, suspended, revoked, terminated, voluntarily relinquished under threat of disciplinary action, or made subject to terms of probation or any other restriction at any health care facility[.]

*Id.* at 63 (§ 4.2). If any of these representations ceased to be true, the Agreement

---

[1]     In the Agreement, Dr. Belnap agreed to help establish the Center, to assist in its day-to-day operations, to manage all non-SLRMC personnel working for the Center, and to ensure that the Center maintained its status as an "advanced abdominal center of excellence," Aplts.' App. at 61 (§ 1.4). In turn, SLRMC agreed to make facilities and resources available to the Center, to develop "a strategic plan, budget, and proposed timeline for financing, constructing, and obtaining appropriate regulatory approvals for the Center," *id.* at 62 (§ 3.2), to acquire necessary equipment, furniture, and furnishings for the Center, and to provide the services of SLRMC personnel.

provided that SLRMC could "terminate th[e] Agreement effective immediately." *Id.* at

66–67 (§ 8.3).

The Agreement contained the following dispute-resolution provision:

> 24. Dispute Resolution. The Parties shall initially attempt to settle any dispute between them (as well as with all or any of the Service Providers; each Party and any such Service Provider being referred to individually in this Section 24 as a "Disputant") arising under or related to this Agreement informally. If the Disputants are unable to resolve the dispute informally, the Disputants shall seek to resolve the dispute through mediation and if mediation fails, shall have the dispute resolved by arbitration. *No Disputant may prosecute any suit until and unless the Disputants have submitted the issues to mediation and, if necessary, to arbitration in Salt Lake County, Utah, in accordance with the rules of JAMS and applying laws of the United States and State of Utah, or another suitable dispute resolution service agreeable to their respective attorneys.* [Dr. Belnap] will secure the agreement of each Service Provider to be bound by the provisions of this Section 24. Notwithstanding the foregoing, [SLRMC] may at any point bring action in a court of competent jurisdiction to enforce the provisions of Section 10 [regarding confidentiality of health information], 14 [regarding the noncompetition agreement] and 15 [regarding SLRMC's confidential information] of this Agreement.

> 24.1 Mediation. Mediation shall be initiated by a Disputant, and the mediation shall be conducted, in accordance with the JAMS mediation guidelines, except as herein provided otherwise. The mediator shall be chosen by the Disputants, or if they are unable to agree within fourteen (14) days, by the applicable representative of JAMS. If the mediator chosen has not succeeded in achieving a mediated settlement after ninety (90) days, any Disputant may initiate resolution of the dispute through arbitration.

> 24.2 Arbitration. If the Disputants are unable to resolve the dispute informally or through mediation, any Disputant may within

4

thirty (30) days of completion of the failed mediation submit the matter to final, binding arbitration, provided that the issue is arbitrable under Utah law. *The arbitration shall be administered by JAMS and conducted in accordance with its Streamlined Arbitration Rules and Procedures (the "Rules"), except as provided otherwise herein.* Selection of an arbitrator shall be made on or before fourteen (14) days after the receipt of the demand for arbitration. In the event the Disputants cannot agree on the selection of an arbitrator within this time, the arbitrator shall be selected pursuant to the Rules. A preliminary conference shall be held as provided in the Rules. The Disputants, the JAMS Case Manager and the arbitrator shall maintain the substance of any proceedings hereunder in confidence and the Case Manager and the arbitrator, prior to any proceedings being held hereunder, shall sign an agreement whereby they agree to keep the substance of any proceedings hereunder in confidence. The arbitrator may award, wholly or in such partial amount(s) as the arbitrator determines, any Disputant its costs of the arbitration proceeding (including attorneys fees) at the expense of the other Disputant(s).

*Id.* at 73, 75 (§ 24) (emphases added).

On March 18, 2013, SLRMC's Medical Executive Committee ("MEC") suspended Dr. Belnap's medical privileges. The suspension was based on allegations that Dr. Belnap had sexually harassed an SLRMC employee, as well as "other allegations of prior incidents." Aplts.' App. at 17. Dr. Belnap challenged the suspension by requesting a fair hearing pursuant to the Bylaws. *Id.* at 18. SLRMC's Fair Hearing Committee ("FHC") held a hearing and determined that "the MEC's actions on the whole were not supported by the evidence, and were arbitrary and capricious." *Id.* at 19. As a result, the FHC recommended that the MEC vacate Dr. Belnap's suspension. When the MEC adopted the FHC's recommendations, the Board of Trustees vacated the suspension in full.

5

While Dr. Belnap was suspended, however, SLRMC sent a report to the National Practitioner Data Bank regarding his suspension. Although SLRMC voided the report after the suspension was vacated, SLRMC allegedly "failed to notify other organizations that the report had been retracted, which triggered inquiries from various entities," and it also allegedly did not "adequately correct the factual record after the conclusion of the Fair Hearing proceedings, which caused Dr. Belnap further harm and expense." *Id.* at 21–22. Furthermore, after the suspension was lifted, SLRMC's CEO issued a letter indicating that Dr. Belnap's reappointment to active medical staff, and the renewal of his surgical privileges, had been "extended" for three months—rather than the customary two-year renewal period. *Id.* at 22. According to Dr. Belnap, the letter "referenced the Fair Hearing process [but] did not indicate that Dr. Belnap [had been] cleared of all allegations of wrongdoing." *Id.*

**B**

On February 7, 2014, Dr. Belnap filed a lawsuit in the United States District Court for the District of Utah against: (1) SLRMC, (2) SLRMC's alleged parent company, Iasis Healthcare Corporation ("Iasis"),[2] (3) four physician members of the MEC, (4) an SLRMC Risk Manager, Kathy Oleson, and (5) Does 1–10 (collectively, "Defendants").

The Complaint asserts seven causes of action:

---

[2]     The parties agree that Iasis is *not*, in fact, SLRMC's parent company. Apparently, SLRMC's parent company is IASIS Healthcare Holdings, Inc. The parties have offered to meet and confer to resolve this issue. This discrepancy is not material to our resolution of this appeal and the parties do not argue to the contrary.

6

(1) combination and conspiracy in restraint of trade in violation of federal antitrust laws by scheming "to eliminate Dr. Belnap as a competitor" and "prevent the market entry of a new and more efficient transplant or abdominal surgery specialty center in the marketplace," against all Defendants, Aplts.' App. at 24–25 (alleging that Defendants have "succeeded" in "not creating the Center promised to him");

(2) breach of contract for violation of the Bylaws by, *inter alia*, improperly suspending Dr. Belnap based on "personal animus and desire to get Dr. Belnap 'fired,'" against SLRMC, *id.* at 26;

(3) breach of implied covenant of good faith and fair dealing for "actions made in bad faith and with malice to achieve the suspension of Dr. Belnap, in violation of SLRMC's Bylaws," against SLRMC, *id.* at 27;

(4) defamation for making false printed and oral statements that harmed Dr. Belnap's reputation and "may lead to his exclusion from participation on . . . health insurance panels, effectively ending his career," against all Defendants, *id.* at 28;

(5) intentional infliction of emotional distress for suspending Dr. Belnap "with the intended purpose of denying [him] the opportunity to perform the professional services for which he has been trained" and "effectively barr[ing] the creation of a Center that was promised to Dr. Belnap when he came to SLRMC," against all Defendants, *id.* at 30;

(6) application for an injunction prohibiting Defendants from restraining competition, defaming Dr. Belnap, and unreasonably scrutinizing his practice, and requiring Defendants to circulate a statement of support and retract all negative information regarding Dr. Belnap, against all Defendants, *see id.* at 30–31; and

(7) request for a declaration that Defendants are not entitled to immunity under the Health Care Quality Improvement Act because "Defendants' actions were taken to promote the improper goal of terminating Dr. Belnap's active staff membership at SLRMC and removing him from the Hospital and marketplace," against all Defendants, *id.* at 32.

Defendants moved to stay the litigation and compel mediation and/or arbitration of

7

all of Dr. Belnap's claims on April 1, 2014. They argued that the Agreement's dispute-resolution provision governs the instant dispute. They pointed to the Complaint's allegations that reference the Agreement and/or the Center, as well as the fact that each cause of action "incorporates by reference all of the Complaint's earlier factual allegations . . . including those concerning the Center," Aplts.' App. at 41, and argued that "[a]ll of the[] causes of action arise under or relate to the Agreement because all of them are premised on the same alleged misconduct and resulting harm to Plaintiff," *id.* at 43. In addition, Defendants further argued that the litigation should be stayed in favor of arbitration because the Agreement's "arbitration clause evidences [the parties'] clear intent that any question of arbitrability—*i.e.*, whether a claim should be arbitrated—should be determined by the arbitrator." *Id.* at 48. Dr. Belnap opposed the motion.

The district court ultimately granted in part and denied in part the motion. First, the court asserted that "[w]hen one party alleges the dispute is subject to an agreement to arbitrate, the court must first determine if the claims are within the scope of the contract within which the agreement to arbitrate is nested." *Id.* at 147 (Mem. Decision & Order, filed Jan. 28, 2015). Then, the court observed that the arbitration clause in the Agreement "is broad in the abstract and would likely cover the current causes of action." *Id.* at 151. Nevertheless, the court proceeded to "perform a preliminary analysis of all of the claims to determine if they fall within the scope of the contract." *Id.* at 152.

The court held that the first cause of action is within the scope of the Agreement

8

because it "makes numerous references to the Center," Aplts.' App. at 152, and because it alleges that "SLRMC had a duty to create the Center, and the alleged anticompetitive actions are in direct conflict with that duty," *id.* at 153. Accordingly, the court granted the motion to compel as to that cause of action against SLRMC. However, citing cases that allowed arbitration to proceed only as to *signatories* to an agreement, the court did not stay the claim as to the non-SLRMC Defendants who had not signed the Agreement.

Then, the court held that the remaining six causes of action are outside the scope of the Agreement. The court reasoned that "[t]he plain language of the Agreement clarifies that the Agreement is . . . . a contract with a specific and limited scope," *id*. at 153, and each of the remaining claims "centers on the investigation of an incident, ruling, and subsequent punishment by the MEC wholly unrelated to the 'Services' contemplated under the Agreement for the Center," *id.* at 154.

Finally, the court rejected Defendants' argument that the parties had agreed, in the dispute-resolution provision of the Agreement, that questions of arbitrability should be decided by an arbitrator. The court acknowledged that, in the Agreement, the parties clearly and unmistakably intended to arbitrate arbitrability. *Id.* at 154–55 ("It is true that incorporating 'the JAMS rules demonstrates the parties' clear and unmistakable intent to submit questions of arbitrability to the arbitrator.'" (quoting the motion)). However, the court reasoned that "[d]etermining whether the claims are within the scope of the contract . . . necessarily precedes any question of arbitrability, and precedes the question of who decides questions of arbitrability." *Id.* at 155. In sum, therefore, the court stayed the first

9

cause of action as to SLRMC, ordered Dr. Belnap and SLRMC to proceed to arbitration on the arbitrability of that claim, and denied the rest of the motion.

## II

Defendants appeal from the portions of the district court's order denying their motion to stay litigation and to compel arbitration.[3] Defendants present two arguments on appeal. First, they argue that because the parties agreed to arbitrate arbitrability, the district court erred when it failed to submit all questions of arbitrability to an arbitrator. Second, Defendants argue that even if the parties did *not* agree to arbitrate arbitrability, the district court erred when it found that any of Dr. Belnap's claims fell outside the scope of the Agreement, despite also finding that the Agreement's dispute-resolution provision was broad. Under our resolution of this appeal, we have no need to address this second argument.

We begin by addressing the arbitrability of Dr. Belnap's claims as they relate to SLRMC, the only Defendant that signed the Agreement. We conclude that by incorporating the JAMS Rules into the Agreement, Dr. Belnap and SLRMC evidenced a clear and unmistakable intent to delegate questions of arbitrability to an arbitrator. Consequently, in our view, the district court's next step should have been to compel *all* of

---

[3]  "The Federal Arbitration Act ["FAA"] grants a party the right to file an interlocutory appeal from the denial of a motion to compel arbitration." *McCauley v. Halliburton Energy Servs., Inc.*, 413 F.3d 1158, 1160 (10th Cir. 2005) (citing 9 U.S.C. § 16(a)(1)(C)). On the filing of this appeal, the district court properly stayed the case. *See id.* ("[U]pon the filing of a non-frivolous . . . appeal, the district court is divested of jurisdiction until the appeal is resolved on the merits.").

10

those claims against SLRMC to arbitration so that an arbitrator could decide arbitrability in the first instance. The court's decision to, instead, conduct its own analysis of the arbitrability of Dr. Belnap's claims against SLRMC was mistaken. Nevertheless, the court reached the right outcome regarding Dr. Belnap's first claim against SLRMC—compelling that claim to arbitration—and we uphold that portion of its order.[4] We are constrained, however, to reverse the order as to the remainder of the SLRMC claims. We remand, instructing the court to compel *all* of Dr. Belnap's claims against SLRMC to arbitration.

Then, we address the arbitrability of Dr. Belnap's claims against the Defendants that did not sign the Agreement—namely, SLRMC's alleged parent company and the individual Defendants. We determine that these Defendants are not entitled to enforce the arbitration provision of the Agreement. Thus, we affirm the district court's order in this respect; specifically, we conclude that it properly denied the motion as to all claims against all non-SLRMC Defendants.

## A

We review de novo the denial of a motion to stay litigation and to compel arbitration. *See, e.g.*, *Ragab v. Howard*, 841 F.3d 1134, 1137 (10th Cir. 2016); *Sanchez v.*

---

[4] We may unquestionably affirm, under the circumstances present here, a portion of the district court's order—regarding the first claim—under an alternative legal rationale that the record amply supports. *See, e.g.*, *A.M. v. Holmes*, 830 F.3d 1123, 1146 n.11 (10th Cir. 2016); *Jordan v. U.S. Dep't of Justice*, 668 F.3d 1188, 1200 (10th Cir. 2011).

11

*Nitro-Lift Techs., L.L.C.*, 762 F.3d 1139, 1145 (10th Cir. 2014); *Cummings v. FedEx Ground Package Sys., Inc.*, 404 F.3d 1258, 1261 (10th Cir. 2005).

**B**

**1**

The parties agree that issues of arbitrability are governed by the Federal Arbitration Act. *See, e.g.*, *Comanche Indian Tribe of Okla. v. 49, L.L.C.*, 391 F.3d 1129, 1131 (10th Cir. 2004) (stating that the FAA "applies to all arbitration agreements 'involving commerce,' and 'create[s] a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act.'" (alteration in original) (first quoting 9 U.S.C. § 2; then quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983))); *see also id.* at 1132 ("The requirement that the underlying transaction involve commerce 'is to be broadly construed so as to be coextensive with congressional power to regulate under the Commerce Clause.'" (quoting *Foster v. C.F. Turley, Jr.*, 808 F.2d 38, 40 (10th Cir. 1986))).

Under the FAA, 9 U.S.C. § 1–16, "arbitration is a matter of contract," and courts must "place[] arbitration agreements on an equal footing with other contracts, and . . . enforce them according to their terms." *Rent–A–Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (citation omitted); *accord AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648 (1986). More specifically, the FAA's "primary substantive provision," § 2, states that "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid,

12

irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; *accord Rent–A–Center*, 561 U.S. at 67. To "implement § 2's substantive rule," "a party may apply to a federal court for a stay of the trial of an action 'upon any issue referable to arbitration under an agreement in writing for such arbitration'" pursuant to § 3 of the FAA, and "a party 'aggrieved' by the failure of another party 'to arbitrate under a written agreement for arbitration' may petition a federal court 'for an order directing that such arbitration proceed in the manner provided for in such agreement'" under § 4 of the FAA. *Rent–A–Center*, 561 U.S. at 68 (first quoting 9 U.S.C. § 3; then quoting 9 U.S.C. § 4). Indeed, § 4 provides that a "court 'shall' order arbitration 'upon being satisfied that the making of the agreement for arbitration . . . is not in issue.'" *Id.* (quoting 9 U.S.C. § 4).

Because "arbitration is simply a matter of contract," "[j]ust as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995) (citations omitted); *see also Rent–A–Center*, 561 U.S. at 69 ("An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."); *AT & T Techs.*, 475 U.S. at 649 (stating that parties may agree to arbitrate arbitrability). Critically for our purposes, the Supreme Court has held that when parties agree that an arbitrator should decide

13

arbitrability, they delegate to an arbitrator all threshold questions concerning arbitrability—including "whether their agreement covers a particular controversy." *Rent–A–Center*, 561 U.S. at 68–69; *accord BG Grp. PLC v. Republic of Arg.*, 134 S. Ct. 1198, 1206 (2014) (stating that arbitrability disputes "include questions such as 'whether the parties are bound by a given arbitration clause,' or 'whether an arbitration clause in a concededly binding contract applies to a particular type of controversy'" (quoting *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002))).

Given that parties can agree to arbitrate arbitrability, as well as other issues, questions of arbitrability encompass two types of disputes: (1) disputes about "*whether* a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement," *First Options*, 514 U.S. at 944–45; and (2) threshold disputes about "*who should have the primary power to decide*" whether a dispute is arbitrable, *id*. at 942. When addressing the first type of dispute—whether a dispute is arbitrable—"any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24–25. However, when addressing the second type of dispute—that is, "when courts decide whether a party has agreed that *arbitrators* should decide arbitrability"—courts "should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *First Options*, 514 U.S. at 944 (alteration in original) (emphasis added) (quoting *AT & T Techs.*, 475 U.S. at 649); *accord Dean Witter Reynolds, Inc. v. Howsam*, 261 F.3d 956, 964 (10th Cir. 2001), *overruled on other*

14

*grounds by Howsam*, 537 U.S. 79.

Importantly, courts must address the second type of dispute first. In other words, the question of *who* should decide arbitrability precedes the question of *whether* a dispute is arbitrable. *See Riley Mfg. Co. v. Anchor Glass Container Corp.*, 157 F.3d 775, 779 (10th Cir. 1998) ("Before we address the specific arbitrability of the claims raised . . . in [this] federal suit, we must address the threshold issue of who decides arbitrability in the first place—the courts or an arbitrator."); *cf. Commc'n Workers of Am. v. Avaya, Inc.*, 693 F.3d 1295, 1303 (10th Cir. 2012) ("The court should have *begun* its analysis by asking whether the parties did or said anything to rebut the presumption that questions about the arbitrability of an arbitration dispute will be resolved by the courts. Assuming the answer was no, the court should have *then* determined whether there was a fact issue regarding the parties' consent to submit to arbitration the dispute . . . ." (emphases added)).

We begin, therefore, by addressing the issue of *who* should decide arbitrability. In this regard, we conclude that there is clear and unmistakable evidence that Dr. Belnap and SLRMC agreed that an arbitrator should decide all questions of arbitrability. Indeed, the district court found as much. However, in the light of such evidence, the district court should have stayed the litigation and compelled all claims against SLRMC to arbitration so that an arbitrator could decide their arbitrability in the first instance. Then, we conclude that the non-SLRMC defendants cannot compel Dr. Belnap to arbitrate his claims against them based on the Agreement that they never signed.

15

**2**

In our view, Dr. Belnap and SLRMC clearly and unmistakably agreed to arbitrate arbitrability when they incorporated the JAMS Rules into the Agreement. JAMS Rule 8(c) provides that:

> Jurisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, *shall be submitted and ruled on by the Arbitrator*. The Arbitrator has the authority to determine jurisdiction and arbitrability issues as a preliminary matter.

Aplts.' App. at 102 (JAMS Streamlined Arbitrations Rules & Procedures) (emphasis added).

Dr. Belnap does not dispute that the JAMS Rules provide for the arbitration of arbitrability disputes; rather, he argues that the parties did not actually incorporate the JAMS Rules into the Agreement. He argues that the parties merely presented those Rules as *one option* for dispute resolution. He points to the Agreement's dispute-resolution provision, which states:

> 24. <u>Dispute Resolution</u>. . . . No Disputant may prosecute any suit until and unless the Disputants have submitted the issues to mediation and, if necessary, to arbitration . . . in accordance with the rules of JAMS . . . *or another suitable dispute resolution service agreeable to their respective attorneys*.
>
> . . . .
>
> 24.2 <u>Arbitration</u>. . . . The arbitration shall be administered by JAMS and conducted in accordance with its Streamlined Arbitration Rules and Procedures (the "Rules"), *except as provided otherwise herein*.

16

Aplts.' App. at 73 (emphases added). According to Dr. Belnap, "[b]ecause the parties were free to select and be governed by the rules of 'another suitable dispute resolution service,' the parties did not know at the time of the agreement what rules they were agreeing to govern any future arbitration." Aplee.'s Resp. Br. at 6.

We are not persuaded by Dr. Belnap's argument. The plain language of the Agreement establishes the JAMS Rules as the default controlling rubric—a fact that would have been quite evident to the parties entering the Agreement. In this regard, the Agreement provides that any deviation from the JAMS Rules would require the mutual assent of the parties. Specifically, the Agreement states that arbitration must be "in accordance with the rules of JAMS . . . or another suitable dispute resolution service *agreeable to their respective attorneys*." Aplts.' App. at 73 (emphasis added). According to this plain language, therefore, if either party refuses to agree to another dispute-resolution service—involving the use of that service's rules—the resolution of disputes would perforce be governed by the JAMS Rules. In this sense, the JAMS Rules are incorporated into the Agreement as default rules, and no definite alternative is specified. In other words, the Agreement's language does not allow for more than an ill-defined *possibility* that—with the Disputant attorneys' agreement—the rules of another service (i.e., non-JAMS Rules) would govern the resolution of the parties' dispute. And such a possibility is not enough for us to say that the JAMS Rules are not the Agreement's ordinary controlling standard. *See C & L Enters., Inc. v. Citizen Band Potawatomi Indian*

17

*Tribe of Okla.*, 532 U.S. 411, 415, 419 n.1 (2001) (explaining that the parties expressly incorporated the American Arbitration Association ("AAA") rules into their agreement, even though the agreement provided that they could "mutually agree otherwise"); *see also RW Dev., L.L.C. v. Cuningham Grp. Architecture, P.A.*, 562 F. App'x 224, 226 (5th Cir. 2014) (unpublished) (concluding that the parties "clearly and unmistakably agreed to arbitrate arbitrability" by incorporating the AAA rules, despite the fact that the arbitration provision explained that the AAA rules would apply, "unless the parties mutually agree[d] otherwise");[5] *Cong. Constr. Co. v. Geer Woods, Inc.*, No. 3:05CV1665, 2005 WL 3657933, at \*2–5 (D. Conn. Dec. 29, 2005) (same).[6]

In arguing that the parties did not incorporate the JAMS Rules into the Agreement, Dr. Belnap relies on a single case from the California Court of Appeals. In that case, *Gilbert Street Developers, LLC v. La Quinta Homes, LLC*, 94 Cal. Rptr. 3d 918 (Cal. Ct. App. 2009), the court considered an arbitration clause that required arbitration to be "conducted in accordance with the Rules of the American Arbitration Association [AAA] existing at the date thereof." *Id.* at 919. At the time the agreement was signed, however, the AAA had no rule providing that arbitrators had jurisdiction to rule on their own

---

[5]     *See United States v. Willis*, 826 F.3d 1265, 1274 n.2 (10th Cir. 2016) ("Although not precedential, we find the reasoning of unpublished opinions, *including those from other jurisdictions*, instructive." (emphasis added)).

[6]     JAMS Rule 8(c) is substantively identical to AAA Rule 7, which states that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim." AAA, Commercial Arbitration Rules and Mediation Procedures ¶ R–7(a) (2013).

jurisdiction. Thus, not too surprisingly, the court held "that a contract which contains the mere possibility that [AAA] rules might one day in the future provide that arbitrators would have the power to decide their own jurisdiction d[id] *not* 'clearly and unmistakably' provide that arbitrators will determine their own jurisdiction." *Id.* In contrast, the rule at issue here—JAMS Rule 8(c)—clearly answered the "who" question by designating the arbitrator as the person to determine questions of arbitrability, and it was already in effect when the parties executed the Agreement. Consequently, *Gilbert Street Developers* is inapposite.

Having concluded that the parties incorporated the JAMS Rules into their Agreement, we therefore determine that Dr. Belnap and SLRMC clearly and unmistakably intended for an arbitrator to decide issues of arbitrability. The soundness of our determination is confirmed by our survey of the limited caselaw in this area.

One of our sister circuits and panels in two other circuits (in unpublished decisions) have specifically addressed whether incorporation of the JAMS Rules clearly and unmistakably delegates questions of arbitrability to an arbitrator, and they have all agreed that it does. *See Cooper v. WestEnd Capital Mgmt., L.L.C.*, 832 F.3d 534, 546 (5th Cir. 2016) (concluding that the express adoption of the JAMS rules presented "clear and unmistakable evidence that the parties agreed to arbitrate arbitrability" (quoting *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012))); *Emilio v. Sprint Spectrum L.P.*, 508 F. App'x 3, 5 (2d Cir. 2013) (holding that incorporation of JAMS Rules "clearly and unmistakably delegated questions of

19

arbitrability to the arbitrator"); *Wynn Resorts, Ltd. v. Atl.–Pac. Capital, Inc.*, 497 F. App'x 740, 742 (9th Cir. 2012) ("By incorporating the JAMS rules, the parties demonstrated their clear and unmistakable intent to have an arbitrator resolve the issue of arbitrability.").

In addition, in an analogous context, all of our sister circuits to address the issue have unanimously concluded that incorporation of the substantively identical (as relevant here) AAA Rules constitutes clear and unmistakable evidence of an agreement to arbitrate arbitrability. *See, e.g.*, *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015) (observing that "[v]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability," and that the court has "found this consensus persuasive in holding that incorporation of the [United Nations Commission on International Trade Law ("UNCITRAL")] rules—which contain a jurisdictional provision 'almost identical' to the one in the AAA rules—constituted 'clear and unmistakable evidence that the parties agreed the arbitrator would decide arbitrability'" (first two alterations in original) (quoting *Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074–75 (9th Cir. 2013) (collecting cases))).[7] *see also Fallo v. High-Tech Inst.*, 559 F.3d

---

[7] In *Oracle*, 724 F.3d at 1074, the Ninth Circuit cited the following cases to support the proposition that "[v]irtually every circuit to have considered the issue has determined that incorporation of the . . . AAA[] arbitration rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability": *Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012); *Fallo v. High-Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009); *Qualcomm Inc. v. Nokia Corp.*, 466

20

874, 878 (8th Cir. 2009) ("Most of our sister circuits that have considered this issue agree with our conclusion that an arbitration provision's incorporation of the AAA Rules—or other rules giving arbitrators the authority to determine their own jurisdiction—is a clear and unmistakable expression of the parties' intent to reserve the question of arbitrability for the arbitrator and not the court."); *Awuah v. Coverall N. Am., Inc.*, 554 F.3d 7, 11 (1st Cir. 2009) (stating that incorporation of the AAA Rules "is about as 'clear and unmistakable' as language can get"); *Contec Corp.*, 398 F.3d at 208 ("[W]hen . . . parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator."); *cf. Chevron Corp. v. Ecuador*, 795 F.3d 200, 207–08 (D.C. Cir. 2015) (holding that incorporation by reference of the UNCITRAL rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability).

Some courts have suggested that the Tenth Circuit is the only federal appellate court that has deviated from this consensus, in *Riley*, 157 F.3d 775. *See Oracle Am., Inc.*, 724 F.3d at 1074; *Fallo*, 559 F.3d at 878. We disagree, however, with this reading of our precedent. It is true that in *Riley*, we did not find clear and unmistakable evidence of intent to arbitrate arbitrability—even though the agreement incorporated the AAA Rules. *See Riley*, 157 F.3d at 777 n.1, 780. *Riley*, however, is distinguishable because

---

F.3d 1366, 1373 (Fed. Cir. 2006); *Terminix Int'l Co. v. Palmer Ranch Ltd.*, 432 F.3d 1327, 1332 (11th Cir. 2005); *Contec Corp. v. Remote Sol. Co.*, 398 F.3d 205, 208 (2d Cir. 2005). All of these cases remain good law.

there—like in *Gilbert Street Developers*, *supra*—the version of the AAA Rules that was incorporated into the agreement did *not* include a provision concerning the arbitration of arbitrability. Thus, *Riley* does not guide, much less control, our analysis regarding the significance of the Agreement's incorporation of the JAMS Rules.

In sum, we conclude that by incorporating the JAMS Rules into the Agreement, Dr. Belnap and SLRMC clearly and unmistakably agreed to submit arbitrability issues to an arbitrator, "including disputes over the . . . interpretation or scope of the agreement under which Arbitration is sought." Aplts.' App. at 102 (JAMS Rule 8(c)). And, because Dr. Belnap and SLRMC clearly and unmistakably agreed to arbitrate arbitrability, we further hold that the district court erred when it determined the arbitrability of Dr. Belnap's claims instead of deferring that determination to an arbitrator.[8] In other words, we conclude that when the parties clearly and unmistakably agreed to arbitrate arbitrability, all questions of arbitrability—including the question of whether claims fall within the scope of the agreement to arbitrate—had to be resolved by an arbitrator.

---

[8]   Recall that the district court mistakenly never decided the threshold question of *who* should decide arbitrability. Instead, it asserted that because "[a]rbitration clauses are still creatures of the contracts in which they are embedded," "[d]etermining whether the claims are within the scope of the contract . . . necessarily precedes any question of arbitrability, and precedes the question of who decides questions of arbitrability." Aplts.' App. at 155. Then, based on its own determination of whether the claims were within the scope of the Agreement—i.e., its own determination of arbitrability—the court granted in part and denied in part the motion to compel arbitration.

22

# 3

## a

To be sure, Dr. Belnap argues that "[c]ontrolling case law and fundamental principles of contract interpretation require a court to make a preliminary analysis of whether the dispute is within the scope of the contract." Aplee.'s Resp. Br. at 7. More specifically, Dr. Belnap urges us to adopt the "wholly groundless" approach of the Fifth, Sixth, and Federal Circuits in, respectively, *Douglas v. Regions Bank*, 757 F.3d 460 (5th Cir. 2014), *Turi v. Main Street Adoption Services, LLP*, 633 F.3d 496 (6th Cir. 2011), and *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366 (Fed. Cir. 2006).

Notably, in *Qualcomm*, 466 F.3d 1366, the Federal Circuit established the following "wholly groundless" test:

> We conclude that in order to be "satisfied" of the arbitrability of an issue pursuant to [9 U.S.C. § 3], the district court should first inquire as to who has the primary power to decide arbitrability under the parties' agreement. If the court concludes that the parties did not clearly and unmistakably intend to delegate arbitrability decisions to an arbitrator, the general rule that the "question of arbitrability . . . is . . . for judicial determination" applies and the court should undertake a full arbitrability inquiry in order to be "satisfied" that the issue involved is referable to arbitration. If, however, the court concludes that the parties to the agreement *did* clearly and unmistakably intend to delegate the power to decide arbitrability to an arbitrator, *then the court should perform a second, more limited inquiry to determine whether the assertion of arbitrability is "wholly groundless."* If the court finds that the assertion of arbitrability is not "wholly groundless," then it should stay the trial of the action pending a ruling on arbitrability by an arbitrator. *If the district court finds that the assertion of arbitrability is "wholly groundless," then it may conclude that it is not "satisfied" under section 3, and deny the moving party's request for a stay.*

23

*Id.* at 1371 (emphases added) (quoting *AT & T Techs.*, 475 U.S. at 649 (source of second

quotation)). *But see id.* at 1375 (Newman, J., dissenting without elaboration).

In *Douglas*, 757 F.3d 460, the Fifth Circuit adopted the Federal Circuit's "wholly

groundless" test. The court explained:

> The mere existence of a delegation provision in the . . . arbitration
> agreement, however, cannot possibly bind [the plaintiff] Douglas to
> arbitrate gateway questions of arbitrability in *all* future disputes with
> the other party, no matter their origin.
>     . . . .
> If it were otherwise, then every case involving an arbitration agreement
> with a delegation provision must, with no exceptions, be submitted for
> such gateway arbitration; no matter how untenable the argument that
> there is some connection between the dispute and the agreement, an
> arbitrator must decide first. Douglas would have to go to the arbitrator,
> who would flatly tell her that this claim is not within the scope of the
> completely unrelated arbitration agreement she signed many years
> earlier when opening a checking account and that she must actually go
> to federal court after all.

*Id.* at 462–63. Concluding, therefore, that "[t]he law of [the Fifth Circuit] does not

require all claims to be sent to gateway arbitration merely because there is a delegation

provision," *id.* at 463, the court held that when the plaintiff agreed to arbitrate

arbitrability, she "meant only to bind herself to arbitrate gateway questions of arbitrability

if the argument that the dispute falls within the scope of the agreement is not wholly

groundless," *id.* at 464.[9] *But see id.* at 464–68 (Dennis, J., dissenting).

---

[9]     Notably, since *Douglas*, the Fifth Circuit has deferred an arbitrability
question to an arbitrator after finding clear and unmistakable intent to arbitrate
arbitrability. Specifically, in *Robinson v. J & K Administrative Management Services,
Inc.*, 817 F.3d 193 (5th Cir. 2016), the Fifth Circuit held that the question of whether class
or collective arbitration is available under an arbitration agreement is the same as any

24

And in *Turi*, 633 F.3d 496, the Sixth Circuit adopted a similar approach when it held that "even where the parties expressly delegate to the arbitrator the authority to decide the arbitrability of the claims related to the parties' arbitration agreement, this delegation applies only to claims that are at least *arguably* covered by the agreement." 633 F.3d at 511. The court reasoned:

> Even if we assume that the parties in the present case delegated to the arbitrator the authority to decide the scope of their arbitration clause, the plaintiffs correctly point out that this delegation would not be unlimited. *A dispute that plainly has nothing to do with the subject matter of an arbitration agreement, for example, would not give the arbitrator the authority to decide the arbitrability of this wholly unrelated claim.* Otherwise, the delegation of authority to the arbitrator to decide the scope of an arbitration agreement would require the parties to take all issues—no matter how unrelated these issues are to the parties' arbitration agreement—to the arbitrator for a threshold determination regarding arbitrability before such issues could properly be brought in court.

*Id.* at 507 (emphasis added).

**b**

Having thoroughly considered its merits, we decline to adopt the "wholly groundless" approach. Neither the Supreme Court nor our court has spelled out the next

---

other threshold question of arbitrability, and like any other threshold question of arbitrability, the question "is deferred to arbitration where the agreement espouses the parties['] intent to do so." *Id*. at 195. The court explained: "the issue before the court. . . . is *who* decides if the arbitration agreement permits class or collective procedures." *Id.* at 198 (emphasis added). Because the court found "unambiguous evidence of the parties['] intention to submit arbitrability disputes to arbitration," *id*. at 198, it held that "the availability of class or collective arbitration [wa]s a question for the arbitrator instead of the court," *id.* at 197. Significantly, in *Robinson*, the Fifth Circuit did not mention the "wholly groundless" test or *Douglas*.

25

steps for a court when it finds clear and unmistakable intent to arbitrate arbitrability.

However, the message that we glean from the language of the Court's opinions and our own, as well as the holdings of our sister circuits, is that courts in that situation must compel the arbitration of arbitrability issues in *all* instances in order to effectuate the parties' intent regarding arbitration.

i

For starters, the "wholly groundless" approach that Dr. Belnap urges us to adopt appears to be in tension with language of the Supreme Court's arbitration decisions—in particular, with the Court's express instruction that when parties have agreed to submit an issue to arbitration, courts must compel that issue to arbitration without regard to its merits. In *AT & T Techs.*, 475 U.S. 643, the Court instructed:

> in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the union's claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator. "The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious."

*Id.* at 649–50 (quoting *United Steelworkers of Am. v. Am. Mfg. Co.*, 363 U.S. 564, 568 (1960)). In *AT & T Techs.*, the Court therefore made clear that when parties agree to

26

submit an issue to arbitration,[10] courts are bound to effectuate the parties' intent by compelling arbitration—no matter what the court thinks about the merits of the issue.

For example, consistent with this precedent, the Court has held that because an arbitration agreement clearly and unmistakably delegated to an arbitrator the issue of whether it was enforceable, challenges to the agreement's enforceability were for an arbitrator—not a court—to decide. *See Rent–A–Center*, 561 U.S. at 66. The agreement at issue in *Rent–A–Center* contained a provision stating that "[t]he Arbitrator . . . shall have exclusive authority to resolve any dispute relating to the . . . enforceability . . . of this Agreement." *Id.* at 68 (first alteration in original) (omissions in original) (quoting the record). The Court stated that "the FAA operates on this additional arbitration agreement just as it does on any other." *Id.* at 70. And because the plaintiff was challenging the enforceability of the agreement as a whole—not the delegation provision in particular—the Court held that the issue of the agreement's enforceability was, as the parties had instructed, for an arbitrator to decide. *See id.* ("[A] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate."). The Court therefore refused to reach the merits of the enforceability dispute—*viz.*, it declined (among other things) to

---

[10]    In that case, the issue that the parties agreed to submit to arbitration was whether an employer violated a collective-bargaining agreement. In this case, the issue is whether Dr. Belnap's claims against SLRMC are arbitrable. Because delegation provisions are as enforceable as any other provision in an arbitration agreement, *see Rent–A–Center*, 561 U.S. at 69, the quoted passage applies to issues of arbitrability just as much as to any other issue that parties agree to arbitrate.

determine whether the dispute was frivolous—leaving that matter for an arbitrator to decide. *See id.* at 72. In doing so, the Court reinforced that when parties clearly and unmistakably delegate an issue to an arbitrator, courts must compel arbitration of that issue.

**ii**

Furthermore, language in several of our cases—although arguably dicta—strongly suggests that courts in that delegation situation must compel the arbitration of arbitrability issues in order to effectuate the parties' intent. More specifically, we have repeatedly stated that courts reviewing arbitrability claims must first ask *who* should decide arbitrability, and suggested that only if the parties did *not* delegate questions of arbitrability to an arbitrator may courts reach the merits of arbitrability questions themselves. *See Riley*, 157 F.3d at 779 ("Before we address the specific arbitrability of the claims raised . . . in [this] federal suit, we must address the threshold issue of *who* decides arbitrability in the first place—the courts or an arbitrator." (emphasis added)); *see also Burlington N. & Santa Fe Ry. Co. v. Pub. Serv. Co. of Okla.*, 636 F.3d 562, 568 (10th Cir. 2010) ("So long as the parties have *not* specifically agreed to submit the arbitrability[] question itself to arbitration (i.e., to arbitrate arbitrability), a court will decide independently whether the merits of the parties' dispute is arbitrable." (emphasis added)); *cf. Avaya, Inc.*, 693 F.3d at 1303 ("The court should have begun its analysis by asking whether the parties did or said anything to rebut the presumption that questions about the arbitrability of an arbitration dispute will be resolved by the courts. Assuming

28

the answer was no, the court should have then determined whether there was a fact issue regarding the parties' consent to submit to arbitration the dispute . . . ."); *id.* (stating that disputes concerning arbitration "are to be resolved by the courts *unless* the parties have agreed, in 'clear and unmistakable' terms, to submit them to arbitration" (emphasis added) (quoting *Rent–A–Center*, 561 U.S. at 79)). Moreover, we have stated that if a court concludes that parties agreed to arbitrate an issue, the court must stay litigation in favor of arbitration. *See Williams v. Imhoff*, 203 F.3d 758, 764 (10th Cir. 2000) ("Under the FAA, a 'court must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding.'" (quoting *McMahan Sec. Co. v. Forum Capital Mkts. L.P.*, 35 F.3d 82, 85 (2d Cir. 1994))).

However, Dr. Belnap points to two cases in which, according to him, we have held to the contrary. Yet, critically, the threshold question of *who* should decide arbitrability was not raised in either case—that is, it was not disputed that arbitrability was for the court to decide. First, in *Sanchez*, 762 F.3d 1139, we addressed "a dispute concerning the scope of an arbitration clause between Nitro-Lift Technologies, L.L.C. ("Nitro-Lift"), and three of its former employees." *Id.* at 1141. Each employee had signed a "Confidentiality/Non-Compete Agreement" with Nitro-Lift at the start of his employment, *id.* at 1141, and each agreement included an arbitration clause providing that "[a]ny dispute, difference or unresolved question between Nitro-Lift and the Employee . . . shall be settled by arbitration . . . in accordance with the [AAA] rules," *id.* at 1142 (emphasis omitted). When the employees sued Nitro-Lift for failure to pay

29

overtime wages, Nitro-Lift moved to compel arbitration on the basis of this arbitration clause. *Id.* at 1143. The district court denied the motion.

We began our opinion by stating that "[w]hen both parties dispute whether an arbitration clause in a contract 'applies to a particular type of controversy, [the question] is for the court.'" *Id.* at 1145 (quoting *Cummings*, 404 F.3d at 1261). Then, we analyzed "whether plaintiffs agreed to submit their . . . wage disputes to binding arbitration" by "determining whether [the wage disputes] fall[] within the scope of an arbitration clause." *Id.* at 1145. Significantly, we never attempted in *Sanchez* to discern whether the parties clearly and unmistakably agreed to submit questions of arbitrability to an arbitrator. This can perhaps be explained by the lack of evidence that the parties in *Sanchez* ever contested this issue and put it before the court for decision.

More specifically, our review of the briefing in *Sanchez* confirms that the parties never challenged whether a court should decide arbitrability. In other words, in Nitro-Lift's appellate briefs in support of its motion to compel, it never argued that arbitrability was for an arbitrator to decide—indeed, it never mentioned the words "clear and unmistakable." *See* Aplts.' Opening Br., Nos. 12-7046 & 12-7057, 2012 WL 5178142 (filed Oct. 10, 2012); Aplts.' Reply Br., Nos. 12-7046 & 12-7057, 2013 WL 4401213 (filed Aug. 8, 2013).[11] And, in the employees' response brief, they argued only that their

[11] "Although we are not obliged to do so, we may exercise our discretion to take judicial notice of publicly-filed records in our court and certain other courts concerning matters that bear directly upon the disposition of the case at hand." *United States v. Ahidley*, 486 F.3d 1184, 1192 n.5 (10th Cir. 2007); *accord St. Louis Baptist*

30

claims did not fall within the scope of the agreement. *See* Aplees.' Resp. Br., No. 12-7057, 2013 WL 3597853 (filed July 8, 2013). In sum, in *Sanchez*, the parties never raised the issue of *who* should decide arbitrability. Accordingly, we cannot reasonably infer that the *Sanchez* court considered and resolved the issue. *See Cone v. Bell*, 556 U.S. 449, 482 (2009) ("Appellate courts generally do not reach out to decide issues not raised by the appellant."); *Webster v. Fall*, 266 U.S. 507, 511 (1925) (declining to find earlier decisions dispositive, because "in none of them was the [relevant] point . . . suggested or decided" and thus "[t]he most that [could] be said is that the point was in the cases if any one had seen fit to raise it"); *see also United States v. Taylor*, 514 F.3d 1092, 1099 (10th Cir. 2008) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." (quoting *United Food & Commercial Workers Union, Local 1564*, 207 F.3d 1193, 1199 (10th Cir. 2000))); *cf. New York v. United States*, 505 U.S. 144, 203 (1992) (White, J., concurring in part and dissenting in part) ("Silence by this Court on a subject is not authority for anything."). Thus, Dr. Belnap's reliance on *Sanchez* is misplaced.

Dr. Belnap also argues that a second Tenth Circuit case, *Coors Brewing Co. v. Molson Breweries*, 51 F.3d 1511 (10th Cir. 1995), supports his position. In *Coors*, Coors Brewing Company entered into a licensing agreement with Molson Breweries under which Molson would brew and distribute Coors products in Canada. The agreement

---

*Temple v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979).

31

contained an arbitration clause stating, "Any dispute arising in connection with the implementation, interpretation or enforcement of this Agreement, . . . shall be finally settled under the Rules of the [AAA]." *Id.* at 1513. When Molson subsequently partnered with Miller Brewing Company to distribute Miller products in Canada, Coors sued both Molson and Miller for antitrust violations. *See id.* Molson moved to compel arbitration based on the arbitration clause in its agreement with Coors. *See id.* The district court denied the motion.

On appeal, we decided only whether Coors's substantive claims fell within the scope of the agreement, and never engaged (or even mentioned) the distinct, antecedent question of *who* was charged under the agreement with deciding arbitrability. *See id.* at 1513–18. Rather, we proceeded on the uncontested premise that questions of arbitrability remained with the court. Yet, like *Sanchez*, the *Coors* briefing reveals that the parties never questioned whether the arbitrability question was reserved in the agreement for the arbitrator; instead, they quarreled only over whether Coors's antitrust claim fell within the scope of the arbitration agreement, and then whether the claims of non-arbitrating parties should be stayed pending arbitration. *See* Aplts.' Opening Br., No. 94-1217 (filed June 30, 1994); Aplee.'s Resp. Br., No. 94-1217 (filed Aug. 1, 1994); Aplts.' Reply Br., No. 94-1217 (filed Aug. 12, 1994). Like *Sanchez*, because the parties never briefed it and the court did not expressly address it, we cannot infer from *Coors*'s analysis that the court considered, much less resolved the *who* question—*viz.*, whether, under the agreement, the contracting parties' clear and unmistakable intent was that arbitrability questions be

32

delegated to the arbitrator. *See, e.g.*, *Webster*, 266 U.S. at 511; *Taylor*, 514 F.3d at 1099. Accordingly, *Coors* lends Dr. Belnap no succor.

### iii

Finally, although this is a question of first impression in our court, a majority of our sister circuits have concluded that a finding of clear and unmistakable intent to arbitrate arbitrability—which may be inferred from the parties' incorporation in their agreement of rules that make arbitrability subject to arbitration—obliges a court to decline to reach the merits of an arbitrability dispute regarding the substantive claims at issue. For example, in *Apollo Computer, Inc. v. Berg*, 886 F.2d 469 (1st Cir. 1989), the First Circuit affirmed a district court order permitting arbitration before the International Chamber of Commerce ("ICC") to proceed; specifically, the court affirmed the district court's decision to reject plaintiff-appellee Apollo's attempt to permanently stay arbitration. *Id.* at 473–74.

Notably, the First Circuit ruled under an alternative rationale. The district court had recognized that "the parties contracted to submit issues of arbitrability to the arbitrator," but it nevertheless "proceeded to analyze the issue of arbitrability itself" and arrived at a conclusion favorable to arbitration. *Id.* at 472. In contrast, the First Circuit reasoned that "[b]y contracting to have all disputes resolved according to the Rules of the ICC, . . . Apollo agreed to be bound by . . . . Rules [that] clearly and unmistakably allow the arbitrator to determine her own jurisdiction." *Id.* at 473. Unlike the district court, the First Circuit understood that the ineluctable directive stemming from this determination

33

as to the *who* issue was that it must *not* go forward to examine whether the substantive claims at issue were arbitrable. *See id.* at 472 ("We do not reach any of [the arbitrability] arguments because we find that the parties contracted to submit issues of arbitrability to the arbitrator.") Instead, "without expressing any opinion on the merits of the issues raised by Apollo," the court affirmed the district court's order denying a permanent stay of arbitration and left such issues to the arbitrator. *Id.* at 474.

The Second Circuit took the same approach when it, for example, stated that "a court must begin by deciding whether the parties before it clearly and unmistakably committed to arbitrate questions regarding the scope of their arbitration agreement," and "[i]f—but only if—the answer is *no*, the court must then proceed to determine on its own whether the parties' dispute falls within the scope of their agreement to arbitrate." *VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P.*, 717 F.3d 322, 326 (2d Cir. 2013) (adding that "[t]he question of *who* is to decide whether a dispute is arbitrable is one that must necessarily precede the question of *whether* a dispute is arbitrable," stating that when a court finds that the parties clearly and unmistakably agreed to arbitrate questions of arbitrability, its "work [is] done," and remanding for the district court to decide "who—the court or the Arbitral Tribunal—has the power to determine the scope of the alleged arbitration agreement").[12]

---

[12] The Second Circuit has reached this conclusion many times. *See, e.g.*, *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 395 (2d Cir. 2011) ("Because both parties [clearly and unmistakably agreed] to having questions of arbitrability[] . . . determined by the arbitral panel in the first instance, we do not reach their merits here.");

34

The Fourth Circuit has also held that "[a]rbitrability disputes often necessitate a two-step inquiry. First, we determine *who* decides whether a particular dispute is arbitrable: the arbitrator or the court. Second, if we conclude that the court is the proper forum in which to adjudicate arbitrability, we then decide *whether* the dispute is, in fact, arbitrable." *Peabody Holding Co. v. United Mine Workers of Am., Int'l Union*, 665 F.3d 96, 101 (4th Cir. 2012) (citation omitted). In *Peabody Holding*, after the Fourth Circuit concluded that the parties had *not* clearly and unmistakably delegated arbitrability questions to an arbitrator, it observed the following: "Accordingly, we must proceed to decide whether this dispute is arbitrable"; and, in a nod to the antecedent *who* issue, it later reiterated, "Finding that the parties have committed to the court the authority to determine whether this dispute is arbitrable, we turn to that inquiry." *Id.* at 103.

In addition, the Eighth Circuit has held that because parties clearly and unmistakably intended to arbitrate arbitrability, a district court erred in denying a motion to compel arbitration. *See Fallo*, 559 F.3d at 880. Significantly, after reaching this conclusion, the Eighth Circuit stated that it did not have to reach the issue of whether "the district court erred in finding that the . . . claims were not within the scope of the

---

*All. Bernstein Inv. Research & Mgmt., Inc. v. Schaffran*, 445 F.3d 121, 127 (2d Cir. 2006) (affirming dismissal of complaint because agreement to arbitrate "clearly and unmistakably evinces the parties' intent to submit to arbitration disputes over arbitrability"); *Shaw Grp. Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115, 125 (2d. Cir. 2003) (concluding that, because "the agreement clearly and unmistakably evidences the parties' intent to arbitrate questions of arbitrability[,] . . . . the district court should have deferred to the arbitrator on the parties' dispute about the arbitrability of that claim").

35

arbitration provision." *Id.* at 880 n.1. And in another case, the Eighth Circuit similarly held that because the parties clearly and unmistakably "'inten[ded] to leave the question of arbitrability to an arbitrator[,]' . . . the district court did not err in declining to rule on the arbitrability of the [agreement's] arbitration provision." *Wootten v. Fisher Invs., Inc.*, 688 F.3d 487, 494 (8th Cir. 2012) (quoting *Fallo*, 559 F.3d at 878).

Furthermore, the Ninth Circuit has held that because parties clearly and unmistakably intended to arbitrate arbitrability, a "district court therefore erred in . . . failing to stay judicial proceedings under . . . the FAA." *Momot v. Mastro*, 652 F.3d 982, 983–84 (9th Cir. 2011).[13] Indeed, the Ninth Circuit has expressly declined to follow one of the cases on which Dr. Belnap relies, *Turi*, 633 F.3d 496, in part because the court was not "persuaded by the reasoning of *Turi*." *Oracle Am., Inc.*, 724 F.3d at 1076. In *Oracle Am., Inc.*, the Ninth Circuit explained that it was not persuaded by *Turi* because "when a

_____

[13]     The Ninth Circuit has consistently adhered to this view. *See, e.g.*, *Brennan*, 796 F.3d at 1132–34 (stating that "[b]ecause a court must enforce an agreement that, as here, clearly and unmistakably delegates arbitrability questions to the arbitrator, the only remaining question is whether the particular agreement *to delegate* arbitrability—the Delegation Provision—is itself unconscionable," and upon concluding that the Delegation Provision was not unconscionable, affirming the dismissal of the complaint); *Oracle Am., Inc,*, 724 F.3d at 1071 (concluding that the parties clearly and unmistakably intended to delegate questions of arbitrability to the arbitrator, and therefore reversing the district court's partial denial of the motion to compel arbitration); *S. Cal. Dist. Council of Laborers v. Berry Constr., Inc.*, 984 F.2d 340, 344 (9th Cir. 1993) ("In general, the resolution of whether a dispute is subject to arbitration is a task for the courts. 'However, the courts will be divested of that authority if the parties "clearly and unmistakably provide" that an arbitrator is to decide whether a dispute is subject to arbitration.'" (quoting *New England Mech., Inc. v. Laborers Local Union 294*, 909 F.2d 1339, 1344–45 (9th Cir. 1990))).

36

tribunal decides that a claim falls within the scope of a carve-out provision [from the delegation provision], it necessarily decides arbitrability"; thus, "*Turi*'s reasoning collapses two separate questions into one." *Id.* at 1076. In other words, *Turi*'s methodology does not give independent, antecedent significance to the *who* issue.

The Eleventh Circuit has also held that because parties clearly and unmistakably agreed to arbitrate whether a plaintiff's claims fall "within the scope of the arbitration agreement," "the decision of whether [the plaintiff's] claims are within the scope of the arbitration agreement is a decision for an arbitrator, and the district court erred in making that decision itself." *In Re Checking Account Overdraft Litig. MDL No. 2036*, 674 F.3d 1252, 1255, 1256–57 (11th Cir. 2012).[14] And, finally, the D.C. Circuit has held that a

---

[14] Like the Second and Ninth Circuits, *see supra* notes 12–13, the Eleventh Circuit has reached this conclusion many times. *See, e.g.*, *Parnell v. Cashcall, Inc.*, 804 F.3d 1142, 1146 (11th Cir. 2015) ("We hold that the Loan Agreement contains a delegation provision and, though Parnell challenged the validity of the arbitration provision, he did not articulate a challenge to the delegation provision specifically. Therefore, the FAA requires that we treat the delegation provision as valid, enforce the terms of the Loan Agreement, and leave to the arbitrator the determination of whether the Loan Agreement's arbitration provision is enforceable."); *id.* at 1148 ("Because the Loan Agreement contains a delegation provision, we only retain jurisdiction to review a challenge to that particular provision. Absent a direct challenge, we must treat the delegation provision as valid and allow the arbitrator to determine the issue of arbitrability."); *id.* at 1149 ("[T]he result in this case merely follows the directive set forth in *Rent–A–Center* and emphasizes that when a would-be plaintiff seeks to challenge an arbitration agreement containing a delegation provision, he or she must challenge the delegation provision directly."); *Terminix Int'l Co.*, 432 F.3d at 1333 (concluding that because the parties clearly and unmistakably agreed that an arbitrator should decide gateway questions including whether the arbitration clause is valid, it was "unnecessary for [the court] to reach those issues," and remanding with instructions to grant the motion to compel arbitration).

district court "did not need to reach the question of whether [the plaintiff's] lawsuits fell within the terms of submission to arbitration because the [relevant treaty] allow[ed] the arbitration tribunal to make that determination." *Chevron Corp.*, 795 F.3d at 207. In *Chevron*, a party to the treaty argued that the district court erred in confirming an arbitration award because the plaintiff's claims fell under an exception to the treaty's arbitration provision. However, the D.C. Circuit concluded that the district court had correctly declined to address whether the plaintiff's claims fell within the scope of that exception because the treaty was "not silent on *who* decides arbitrability." *Id.* (emphasis added). Specifically, the court reasoned that because the treaty incorporated by reference the UNCITRAL rules—which constituted clear and unmistakable evidence that the parties agreed to arbitrate arbitrability—"[t]here was no need for the District Court to independently determine that [the plaintiff's] suits satisfied the [treaty's] parameters once it had concluded that the parties had delegated this task to the arbitrator." *Id.* at 208.

**iv**

In sum, the First, Second, Fourth, Eighth, Ninth, Eleventh, and D.C. Circuits have all held that if a court finds evidence of clear and unmistakable intent to arbitrate arbitrability, it must allow an arbitrator to decide issues of arbitrability in the first instance. And these holdings are consistent with more general language from the Supreme Court and our court, as discussed above. We are persuaded by these authorities. In line with them, because we conclude (as the district court itself found) that Dr. Belnap and SLRMC clearly and unmistakably agreed to arbitrate arbitrability, we must hold that

38

the district court was obliged to eschew consideration of the arbitrability of the claims and to grant the motion to compel arbitration as to *all* of the claims against SLRMC—not just the first one (i.e., antitrust conspiracy).

## C

Next, we address the arbitrability of the claims against the Defendants that did *not* sign the Agreement, the "non-SLRMC" or "nonsignatory" defendants. These Defendants are: (1) SLRMC's alleged parent company, "Iasis"; (2) four physician members of the MEC; (3) an SLRMC Risk Manager; and (4) Does 1–10.

To determine whether these Defendants can compel Dr. Belnap to arbitrate based on the arbitration provision of the Agreement—an agreement that they never signed—we look to Utah law. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630–31 (2009) (holding that the issue of whether a nonsignatory can be bound by or compel arbitration under an arbitration agreement is governed by state law);[15] *see also* Aplts.' App. at 72 (§ 18) ("This Agreement shall be construed in accordance with and governed by the laws of the State of Utah."). Below, we conclude that the Defendants have not asserted a theory under Utah law under which the nonsignatory Defendants can compel Dr. Belnap

---

[15]    *See also Nueterra Healthcare Mgmt., LLC v. Parry*, 835 F. Supp. 2d 1156, 1160–61 (D. Utah 2011) (stating that the Supreme Court held in *Arthur Andersen* that "'litigants who were not parties to the relevant arbitration agreement' can seek a stay under the FAA" because the FAA does not mandate stays "only for disputes between parties to a written arbitration agreement," and concluding that "[t]he issue before the Court is whether under Utah law the Defendants and the nonsignatory . . . entities may enforce, or be bound by, the arbitration agreement" (quoting *Arthur Andersen*, 556 U.S. at 626, 631)).

to arbitrate his claims against them. Thus, we conclude that the district court correctly denied the motion to compel with respect to all of Dr. Belnap's claims against all of the nonsignatory Defendants.

**1**

The district court dealt with the nonsignatory Defendants on a claim-by-claim basis. First, it concluded that the first cause of action fell within the scope of the Agreement; however, it summarily stated that only signatories to the Agreement could compel Dr. Belnap to arbitrate that claim. Then, the court concluded that the remaining six causes of action fell outside the scope of the Agreement, and thus, no Defendant could compel Dr. Belnap to arbitrate those claims.

The nonsignatory Defendants now argue that the district court erred when it refused to compel Dr. Belnap to arbitrate any of his claims against them. Although they did not sign the Agreement, they argue that as principals and agents of SLRMC, they too are entitled to the protection of the Agreement's arbitration provision. More specifically, they argue that "Utah law recognizes at least five theories under which a nonsignatory to an arbitration agreement may be bound." Aplts.' Opening Br. at 34 (citing *Ellsworth v. AAA*, 148 P.3d 983, 989 n.11 (Utah 2006)). They argue, first, that Iasis (i.e., SLRMC's alleged parent company) can invoke a parent-subsidiary estoppel theory. And they argue, second, that the individual Defendants can invoke the theory of agency because they "have been named in this lawsuit based solely on their conduct as members of the MEC and representatives of SLRMC," "their alleged actions were taken as members of

40

SLRMC's MEC acting pursuant to SLRMC's Bylaws," and their "alleged misconduct occurred in [their] capacit[ies] as . . . employee[s] and representative[s] of the Hospital." *Id.* at 35–36.[16]

In response, Dr. Belnap argues that he "did not agree to arbitrate disputes regarding the . . . Agreement with anyone other than SLRMC by specifically limiting arbitration to 'any dispute *between them*,' i.e. between the parties to the contract." Aplee.'s Resp. Br. at 17. Dr. Belnap acknowledges that "there are five exceptions" to the general rule that "only parties to a contract may enforce the rights and obligations created by the contract," but he argues that the estoppel and agency exceptions that the nonsignatory Defendants rely on do not apply here. *Id.* at 18. He explains that estoppel only applies "when the non-signatory seeks to benefit from some portions of the contract but avoid the arbitration provisions," or "when the non-signatory sues the signatory on the agreement after receiving 'direct benefits' but seeks to avoid arbitration"—and he contends that neither of these circumstances applies to Iasis. *Id.* at 18 (quoting *Ellsworth*, 148 P.3d at 989). And Dr. Belnap further argues that the individual Defendants cannot invoke an agency theory because "the Complaint alleges that the individual Defendants

---

[16]    In their reply brief, Defendants argue for the first time—in one footnote and without substantiation—that "[g]iven the parties' 'clear and unmistakable' intent to arbitrate arbitrability, the question of who was covered by the arbitration provision, along with who was entitled to invoke it, were questions for the arbitrator, not the court." Aplts.' Reply Br. at n.5. Because Defendants raised this argument for the first time in their reply brief, we consider it waived and decline to address it. *See, e.g.*, *United States v. Wayne*, 591 F.3d 1326, 1332 n.4 (10th Cir. 2010) ("Because [the appellant] raised this argument for the first time in her reply brief, she has waived it on appeal.").

acted on behalf of themselves," and because, regardless, "[a]n agency relationship with a principal to a contract does not give the agent the authority to enforce a contractual term *for the agent's own benefit*." *Id.* at 19 (quoting *Fericks v. Lucy Ann Soffe Tr.*, 100 P.3d 1200, 1206 (Utah 2004)).

**2**

The Utah Supreme Court has held that "as a general rule, only parties to the contract may enforce the rights and obligations created by the contract." *Fericks*, 100 P.3d at 1205–06 (quoting *Wagner v. Clifton*, 62 P.3d 440, 442 (Utah 2002)). However, that court has stated that "under certain circumstances, a nonsignatory to an arbitration agreement can enforce or be bound by an agreement between other parties." *Ellsworth*, 148 P.3d at 989; *accord CollegeAmerica Servs., Inc. v. W. Benefit Sols., LLC*, No. 2:11CV01208 DS, 2012 WL 1559745, at *2 (D. Utah May 2, 2012). Specifically, "five theories for binding a nonsignatory to an arbitration agreement have been recognized: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter-ego; and (5) estoppel." *Ellsworth*, 148 P.3d at 989 n.11; *accord Nueterra Healthcare Mgmt., LLC v. Parry*, 835 F. Supp. 2d 1156, 1162 (D. Utah 2011). We conclude that the nonsignatory Defendants cannot compel Dr. Belnap to arbitrate under the two theories that they advance here—i.e., estoppel and agency.

**a**

First, we conclude that Iasis has failed to demonstrate that, under Utah law, it may estop Dr. Belnap from avoiding arbitration because it is SLRMC's parent company.

42

The Utah Supreme Court has recognized three circumstances in which nonsignatory estoppel applies. Only one conceivably is relevant here; it applies when a nonsignatory defendant employs estoppel against a signatory plaintiff, instead of the obverse, where a signatory defendant seeks to estop a nonsignatory plaintiff.[17] *See CollegeAmerica Servs., Inc.*, 2012 WL 1559745, at \*2 (explaining that the first two theories of nonsignatory estoppel do not apply because the nonsignatories "[we]re not suing on [the] Agreement and they did not directly benefit from that Contract"). More specifically, the one theory that is conceivably implicated by these facts is the "variety of nonsignatory estoppel [that is] enforced *by a nonsignatory* when the signatory plaintiff sues a nonsignatory defendant on the contract but seeks to avoid the contract-mandated arbitration by relying on the fact that the defendant is a nonsignatory." *Ellsworth*, 148 P.3d at 989 n.12; *accord CollegeAmerica Servs., Inc.*, 2012 WL 1559745, at \*2. Critically, however, Defendants do *not* seek relief under that theory of nonsignatory estoppel. Instead, they argue that yet a *fourth* theory applies—parent-subsidiary nonsignatory estoppel.

---

[17]  In the other two circumstances, "a nonsignatory should be estopped from avoiding arbitration when the nonsignatory seeks to benefit from some portions of the contract but avoid the arbitration provisions," meaning when "the nonsignatory has sued a signatory on the contract to his benefit but sought to avoid the arbitration provision of the same contract"; and "[a] nonsignatory will also be estopped when it receives a 'direct benefit' from the contract which contains the arbitration clause," meaning "when the nonsignatory sued the signatory on the agreement after receiving 'direct benefits' but seeks to avoid arbitration." *Ellsworth*, 148 P.3d at 989 (quoting *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999)).

43

Whether Utah law would recognize such a theory is an unsettled question. Significantly, when an appeal presents an unsettled question of state law, we must ordinarily "attempt to predict how [the] highest court would interpret [the issue]." *Cornhusker Cas. Co. v. Skaj*, 786 F.3d 842, 852 (10th Cir. 2015) (second alteration in original) (quoting *Squires v. Breckenridge Outdoor Educ. Ctr.*, 715 F.3d 867, 875 (10th Cir. 2013)); *see Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002) ("When the federal courts are called upon to interpret state law, the federal court must look to the rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule."); *accord Hays v. HCA Holdings, Inc.*, 838 F.3d 605, 611 (5th Cir. 2016) ("Because no decision of the Texas Supreme Court precisely recognizes intertwined claims estoppel, we 'must make an *Erie* guess and determine as best we can what the Supreme Court of Texas would decide.'" (quoting *Harris Cty. v. MERSCORP Inc.*, 791 F.3d 545, 551 (5th Cir. 2015))); *In re Wholesale Grocery Prod. Antitrust Litig.*, 707 F.3d 917, 927 (8th Cir. 2013) ("Because the Minnesota Supreme Court has not addressed how to apply equitable estoppel, this court must predict how the court would rule."); *see also Hardin v. First Cash Fin. Servs., Inc.*, 465 F.3d 470, 745–76 (10th Cir. 2006) ("Here, [in the arbitration context] because it is undisputed that Oklahoma contract principles guide our analysis . . . . We begin with an examination of case law from Oklahoma's highest court." (citations omitted)). Further, "we are generally reticent to expand state law without clear guidance from its highest court." *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1284 (10th Cir. 2013) (quoting *Taylor v. Phelan*, 9 F.3d 882, 878 (10th

Cir. 1993)).

As noted, the Utah Supreme Court has recognized three *specific* varieties of nonsignatory estoppel, none of which include the parent-subsidiary theory that Defendants urge us to consider here. *See Ellsworth*, 148 P.3d at 989 & n.12. Absent a strong showing to the contrary, we are disinclined to predict that the Utah Supreme Court would recognize another variety; "it is not our place to expand Utah state law beyond the bounds set by the Utah Supreme Court." *Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1280 (10th Cir. 2000) (rejecting the plaintiffs' effort to expand "the tort of unfair competition" beyond the two paradigmatic scenarios that the Utah Supreme Court addressed); *see also Aclys Int'l v. Equifax*, 438 F. App'x 689, 692–93 (10th Cir. 2011) (unpublished) (declining to expand "Utah's law on negligent misrepresentation" to include a third duty, where the Utah Supreme Court had only described two "duties giving rise to negligent misrepresentation claims"); *Orr v. Brigham Young Univ.*, 108 F.3d 1388, at *2 (10th Cir. 1997) (unpublished) (finding no indication that Utah courts would "recogniz[e] a special relationship between a university or college and its student-athletes," where the then-existing "boundaries of Utah law" rejected the notion that "colleges and universities owe a special duty to their adult students"). And Defendants fail to make such a strong showing. Accordingly, we predict that the Utah Supreme Court would not expand the doctrine of nonsignatory estoppel beyond the three varieties that it has explicitly defined to embrace a theory of parent-subsidiary nonsignatory estoppel. *See, e.g.*, *Proctor & Gamble Co.*, 222 F.3d at 1280.

Defendants' showing for the parent-subsidiary theory is especially weak because it has no footing in Utah law. Defendants allege only that the theory was recognized by the federal district court in *Nueterra*, 835 F. Supp. 2d at 1161–63. In *Nueterra*, the United States District Court for the District of Utah held that, even though a parent company plaintiff had not signed an arbitration agreement with the defendants, it nevertheless had to arbitrate its claims against the defendants because the defendants had signed the arbitration agreement at issue with *the parent plaintiff's subsidiary*. *Id.* at 1163. The court reasoned that the nonsignatory parent's relationship with its "wholly owned subsidiary" was "close" and that its claims were "intertwined" with the contract containing the arbitration agreement. *Id.* As to the latter point, the court observed in particular that the nonsignatory parent had sued the signatory defendants based on the contract and that the nonsignatory parent's claims were predicated on its subsidiary's "success in enforcing its rights under the [contract containing the arbitration agreement]." *Id.* The court consequently concluded that the nonsignatory parent had "manifested an intent to be bound by the [contract]"—and, thus, by its arbitration agreement. *Id.*

Defendants claim that *Nueterra* shows that Utah law recognizes a parent-subsidiary theory of nonsignatory estoppel, apparently distinct from the three theories of nonsignatory estoppel that the Utah Supreme Court recognized in *Ellsworth*. We disagree. At the outset, we state the obvious: *Nueterra*—a federal trial court decision—is not binding on us, irrespective of its view of Utah law. *See Salt Lake Tribune Publ'g Co. v. Mgmt. Planning, Inc.*, 454 F.3d 1128, 1134 (10th Cir. 2006) ( "No deference is given to

46

the federal district court's views of state law, which we review *de novo*." (quoting *Colo. Visionary Acad. v. Medtronic, Inc.*, 397 F.3d 867, 871 (10th Cir. 2005))). In addition, *Nueterra* does not clearly rest its relevant holding on decisions of Utah appellate courts.[18] Specifically, in articulating its parent-subsidiary theory of nonsignatory estoppel, the *Nueterra* court does not rely on decisions of the Utah Supreme Court, or any other Utah appellate court for that matter. Rather, it places its principal reliance on a solitary federal district court decision, *I–Link Inc. v. Red Cube Int'l AG*, No. 2:01CV049K, 2001 WL 741315 (D. Utah Feb. 5, 2001). And that case does not even rely on Utah law.

In *I–Link Inc.*, the federal district court turned exclusively to federal decisions from our sister circuits in concluding that the nonsignatory defendant—a "wholly-owned subsidiary" of the codefendant signatory parent, *id.* at *1—had a "sufficiently close" relationship with its parent, and the claims against the subsidiary were "sufficiently

---

[18] To be sure, *Nueterra* does discuss *Ellsworth*. 835 F. Supp.2d at 1163. But it appears to do so, *not* as a material part of its parent-subsidiary analysis, but rather to bolster its ultimate estoppel conclusion by demonstrating its consistency with one of the theories of estoppel that *Ellsworth* previously recognized: that is, where "[a] nonsignatory will also be estopped when it receives a 'direct benefit' from the contract which contains the arbitration clause," meaning "when the nonsignatory sued the signatory on the agreement after receiving 'direct benefits' but seeks to avoid arbitration." *Ellsworth*, 148 P.3d at 989 (quoting *Am. Bureau of Shipping*, 170 F.3d at 353). In this regard, *Nueterra*'s facts are arguably congruent with that *Ellsworth* theory because it involved a nonsignatory *plaintiff* claiming benefits under a contract providing for arbitration through a lawsuit against a signatory defendant. *See Nueterra*, 835 F. Supp.2d at 1162–63. The facts here, on the other hand, are not congruent with this *Ellsworth* theory—*viz.*, this case involves a nonsignatory *defendant* seeking to enforce the arbitration agreement against a signatory plaintiff. Thus, not surprisingly, in relying on *Nueterra*, Defendants have not suggested that the parent-subsidiary theory it espouses turns on state law embodied in this *Ellsworth* theory.

47

intertwined with" the contract containing the arbitration agreement, which the signatory parent had executed, that the signatory *plaintiff* also should be compelled to arbitrate *with* the nonsignatory subsidiary defendant, along with the codefendant signatory parent, *id.* at *5. But, notably, *I–Link* does not even suggest that it is announcing or applying Utah law. Accordingly, *Nueterra*'s reliance on *I–Link* does not ground that decision's parent-subsidiary holding in Utah law.

Thus, we conclude that Defendants— who have placed their reliance on *Nueterra*—have not persuasively demonstrated that Utah law recognizes a parent-subsidiary theory of nonsignatory estoppel. More specifically, for the reasons explicated *supra*, we predict that the Utah Supreme Court would not adopt such a parent-subsidiary theory. Accordingly, because that is the only estoppel theory that they have advanced here, Defendants' estoppel argument necessarily fails.

**b**

Next, we conclude that the individual Defendants have failed to demonstrate that under Utah law, they may require Dr. Belnap to arbitrate with them, as SLRMC's agents. Dr. Belnap does not dispute that the individual Defendants are agents of SLRMC. Instead, he disputes whether Utah law allows nonsignatory agents to enforce contracts *for their own benefit*, as undisputedly would be the case here. Dr. Belnap relies on the Utah Supreme Court's express statement that "an agency relationship with a principal to a contract does not give the agent the authority to enforce a contractual term *for the agent's own benefit*." *Fericks*, 100 P.3d at 1206 (emphasis added). Defendants respond that the

48

Utah Supreme Court announced an exception to the general rule stated in *Fericks* in its subsequent case *Ellsworth*, 148 P.3d 983.

In *Fericks*, 100 P.3d 1200, prospective real estate buyers appealed from the dismissal of their claims against the sellers' agents, as well as the award of attorney's fees to those agents. After reversing the dismissal of the plaintiffs' claims, the Utah Supreme Court addressed the attorney-fee issue to provide guidance to the district court. With respect to the attorney-fee issue, the defendants argued that as agents of the sellers, they were entitled to enforce an attorney-fee provision in the purchase contract that the sellers had signed. The plaintiffs countered that because the agents were not parties to the contract, they could not recover fees under that provision. The Utah Supreme Court held that the defendants were not entitled to attorney's fees—even though they were agents of the signatory sellers—because "an agency relationship with a principal to a contract does not give the agent the authority to enforce a contractual term for the agent's own benefit." *Id.* at 1206.

Two years after handing down *Fericks*, the Utah Supreme Court again applied nonsignatory agency theory in *Ellsworth*, 148 P.3d 983. In *Ellsworth*, a construction company filed an arbitration demand against Mr. Ellsworth and his ex-wife for claims involving a contract that only she had signed. The Utah Supreme Court held that agency theory did not bind Mr. Ellsworth to the arbitration clause in the contract because there was no evidence of an agency relationship between Mr. Ellsworth and his ex-wife. *See Ellsworth*, 148 P.3d at 989.

49

We conclude that *Ellsworth* left unscathed *Fericks*'s express statement that "an agency relationship with a principal to a contract does not give the agent the authority to enforce a contractual term for the agent's own benefit." *Fericks*, 100 P.3d at 1206. *Ellsworth* and *Fericks* dealt with fundamentally different issues and do not conflict. In *Ellsworth*, the alleged agent—the nonsignatory defendant Mr. Ellsworth—never attempted to enforce contractual terms for his own benefit. Instead, the signatory plaintiff did, and so the (alleged) agent sought to *avoid* the enforcement of contractual terms against himself. As a result, the Utah Supreme Court never addressed in *Ellsworth* whether an agent can enforce a contractual term for the agent's own benefit; indeed, the *Ellsworth* opinion did not even mention *Fericks*. Thus, we remain bound by *Fericks*'s express statement that an agent acting for its own benefit cannot enforce such a term. As applied here, because Defendants do not dispute that they seek to enforce the Agreement's arbitration provision for their own benefit, we conclude that they cannot compel Dr. Belnap to arbitrate.

**c**

In sum, neither the estoppel nor the agency exception permits the nonsignatory Defendants to compel Dr. Belnap to arbitrate based on the arbitration provision in the Agreement they never signed. We therefore conclude that the district court correctly denied the motion to compel arbitration with respect to all of the claims against all of the non-SLRMC defendants.

50

## III

Based on the foregoing, as to Dr. Belnap's claims against SLRMC, we **AFFIRM in part** (albeit on alternative grounds) the district court's order insofar as it granted the motion to compel arbitration as to Dr. Belnap's first claim (i.e., antitrust conspiracy), and **REVERSE in part** to the extent that the district court denied the motion to compel arbitration as to the remainder of the claims against SLRMC; consequently, we **REMAND** the case, instructing the district court to grant the motion to compel as to *all* of the claims against SLRMC, so that an arbitrator can determine the arbitrability of the claims in the first instance. As to Dr. Belnap's claims against all of the non-SLRMC Defendants, we **AFFIRM** the district court's order denying the motion to compel arbitration.