[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-15574

_____

D.C. Docket No. 6:15-cv-01637-RBD-DAB

WILLIAM JONES,
on behalf of himself and others similarly situated,

Plaintiff - Appellee,

versus

WAFFLE HOUSE, INC.,
a Georgia corporation,
WH CAPITAL, LLC,
a Georgia limited liability company,

Defendants - Appellants,

THE SOURCE FOR PUBLIC DATA, L.P.,
a foreign limited partnership
doing business as Publicdata.com, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(August 7, 2017)

Before HULL, MARCUS, and CLEVENGER,[*] Circuit Judges.

MARCUS, Circuit Judge:

In this appeal, Waffle House challenges the denial of its motion to compel arbitration.  William Jones applied for a job at a Florida Waffle House in Ormond Beach in December 2014 but was rejected by the store.  Some ten months later, in October 2015, Jones sued Waffle House and various data-reporting companies in federal district court, claiming that the defendants violated the Fair Credit Reporting Act by failing to give him a copy of the background checks that were run on him in connection with his job application and by failing to give him an opportunity to dispute those background checks.  Jones also sought class relief, seeking to represent a class of United States residents who applied for employment or were employed with Waffle House in the preceding five years against whom Waffle House took adverse employment actions based on a background check.

While that lawsuit was pending, Jones continued to seek employment with Waffle House elsewhere, and, in February 2016, Jones applied for and gained employment at a Waffle House store in Kansas City, Missouri.  In connection with his employment, Jones signed an arbitration agreement that covered "all claims and controversies [ ], past, present, or future, arising out of any aspect of or pertaining in any way to [his] employment."  The agreement also included a

---

[*] Honorable Raymond C. Clevenger III, United States Circuit Judge for the Federal Circuit, sitting by designation.

2

delegation provision requiring that "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have authority to resolve any dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement." Jones did not tell the lawyers representing him in the federal lawsuit that he had gained employment with another Waffle House or that he had signed an arbitration agreement. He also did not tell his new employer in Kansas City that he was actively suing Waffle House in Orlando. When Waffle House's legal team later learned, in March 2016, that Jones had signed an arbitration agreement, it moved to compel arbitration pursuant to the agreement. The district court denied the motion and Waffle House timely appealed.

After careful review, we conclude that the district court erred in denying Waffle House's motion to compel arbitration. The arbitration agreement contains a broad, valid, and enforceable delegation provision that expresses the parties' clear and unmistakable intent to arbitrate gateway questions of arbitrability, including questions concerning the interpretation, applicability, enforceability, and formation of the agreement. In the face of the Federal Arbitration Act's clear preference for and presumption in favor of arbitration, we are obliged to enforce the parties' clear intent to arbitrate these issues. We likewise reject Jones's claims that the arbitration agreement improperly interfered with the district court's managerial authority over class actions or that the agreement amounted to an

3

improper ex parte communication with a represented party.  Therefore, we vacate the district court's denial of Waffle House's motion to compel and remand with instructions to stay the case pending arbitration.

I.

This story began when William Jones applied for a job at a Waffle House restaurant in Ormond Beach, Florida, in December 2014.  In connection with the application, the local restaurant managers informed Jones that they had to run a background check on him.  Jones neither heard back from Waffle House nor received a copy of his background check, and his employment application was ultimately denied.

On October 1, 2015, Jones commenced this lawsuit against Waffle House, Inc., and its parent company, WH Capital, LLC (collectively, "Waffle House"), as well as various data-reporting companies (collectively, "PublicData") in the United States District Court for the Middle District of Florida.  Jones alleged that Waffle House and PublicData never provided him with a copy of the background report they ran on him and that they never gave him the opportunity to dispute the accuracy or completeness of the report as they were required to do by the Fair Credit Reporting Act (FCRA), Pub. L. No. 91-508, 84 Stat. 1127 (1970), codified as amended at 15 U.S.C. §§ 1681 et seq.  Jones sought class certification;

4

appointment as class representative; declaratory relief; and statutory, compensatory, special, general, and punitive damages.

While his Florida class-action lawsuit was pending, Jones continued to seek employment with Waffle House elsewhere. Thus, on February 2, 2016, Jones applied to work at a Waffle House in Kansas City, Missouri, which is operated by the Waffle House subsidiary Ozark Waffles, LLC. He did not tell anyone at that Waffle House that he had been denied employment in Florida or that he was suing the parent corporation in the Middle District of Florida. Nor did Jones tell his Florida lawyers that he had sought and gained employment at another Waffle House in another state. Waffle House's corporate management in Norcross, Georgia, was unaware of both his application and his employment.

Jones was hired by the Kansas City Waffle House on or about February 4, 2016. As part of his employee orientation, he signed an arbitration agreement. The agreement is standard for all new Waffle House employees, and local restaurant management typically does not consult with Waffle House's central corporate management or legal department before asking new employees to sign the agreement. The scope of the arbitration agreement is laid out in its coverage provision:

> Waffle House and I will resolve by arbitration all claims and controversies ("claims"), past, present, or future, arising out of any aspect of or pertaining in any way to my employment, and specifically including, but not limited to, termination from employment, that I may have against Waffle House or

5

against its officers, directors, employees or agents in their capacity as such or otherwise, or that Waffle House may have against me.

The agreement also contains a delegation provision, which reads this way:

The Arbitrator, and not any federal, state, or local court or agency, shall have authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement, including but not limited to any claim that all or any part of this Agreement is void or voidable.

Other provisions include, inter alia, a waiver of class-action arbitration and a choice-of-law provision selecting Georgia law. The arbitration agreements are preprinted with the signature of John Waller, Waffle House's Vice President and General Counsel, already affixed; he does not sign each agreement individually. Every new employee receives an arbitration agreement that has already been countersigned by Waller.

Meanwhile, Waffle House's central legal team in Georgia continued to work on Jones's class-action lawsuit and remained unaware that Jones had recently gained employment with the Kansas City Waffle House and signed an arbitration agreement. On March 21, 2016, Greg Newman, Waffle House's Vice President and Litigation Counsel, directed a paralegal to review Jones's file in the company's system in preparation for a quarterly litigation meeting. They noticed that Jones had a "last paid" date of February 2016, meaning that he was currently working for Waffle House and that he must have signed an arbitration agreement. The next

6

day, counsel for Waffle House called Jones's Florida counsel to inform them of these developments.

On April 1, 2016, Waffle House moved the district court to compel arbitration pursuant to the arbitration agreement. Waffle House claimed that the agreement prevented Jones from proceeding with his Florida class-action lawsuit and that, because of the delegation provision, any threshold issues of arbitrability -- including the scope of the agreement -- were issues for the arbitrator, not the district court, to decide. The district court conducted a hearing on this motion and subsequently denied the motion to compel. Waffle House timely appealed. The district court stayed the class-action proceedings pending the outcome of this appeal.

## II.

We review de novo both the district court's denial of a motion to compel arbitration, Jenkins v. First Am. Cash Advance of Ga., LLC, 400 F.3d 868, 873 (11th Cir. 2005), and the district court's interpretation of an arbitration clause, Martinez v. Carnival Corp., 744 F.3d 1240, 1243 (11th Cir. 2014).

It is by now basic hornbook law that the Federal Arbitration Act (FAA), Pub. L. No. 68-401, 43 Stat. 883 (1925), codified as amended at 9 U.S.C. § 1 et seq., reflects "both a liberal federal policy favoring arbitration and the fundamental principle that arbitration is a matter of contract." AT&T Mobility LLC v.

7

Concepcion, 563 U.S. 333, 339 (2011) (quotations and citation omitted). Accordingly, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983).

Among other things, the parties may agree to arbitrate gateway questions of arbitrability including the enforceability, scope, applicability, and interpretation of the arbitration agreement. See Rent-A-Center, W., Inc. v. Jackson, 561 U.S. 63, 68–69 (2010). Indeed, an agreement to arbitrate these gateway issues "is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." Id. at 70. Thus, "[j]ust as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about that matter." First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995) (citations omitted).

An antecedent agreement of this kind is typically referred to as a "delegation provision." See Rent-A-Center, 561 U.S. at 68. When "an arbitration agreement contains a delegation provision -- committing to the arbitrator the threshold

8

determination of whether the agreement to arbitrate is enforceable -- the courts only retain jurisdiction to review a challenge to that specific provision." Parnell v. CashCall, Inc., 804 F.3d 1142, 1144 (11th Cir. 2015). "Only if we determine that the delegation clause is itself invalid or unenforceable may we review the enforceability of the arbitration agreement as a whole." Parm v. Nat'l Bank of Cal., N.A., 835 F.3d 1331, 1335 (11th Cir. 2016). Thus, before deciding whether the district court was correct to deny the motion to compel arbitration, we must determine whether we can address Jones's challenge to the delegation provision and, if so, whether the provision was valid and enforceable.

We may examine a challenge to a delegation provision only if the claimant "challenge[d] the delegation provision directly." Parnell, 804 F.3d at 1144. That is, Jones must have alleged that the delegation provision specifically -- and not just the agreement as a whole -- can be "defeated by fraud, duress, unconscionability, or another generally applicable contract defense." Id. at 1146 (quotations omitted).

While the district court addressed Jones's claims as if they specifically challenged the delegation provision, it is not clear to us that Jones's claims were sufficiently focused on that provision alone rather than on the agreement as a whole. In district court, Jones claimed that "the arbitration agreement does not even encompass [his] claims in this lawsuit," that the agreement as a whole "is an unauthorized ex parte communication between counsel and a represented party,"

9

and that "the arbitration agreement is unconscionable." The only arguments that were even remotely aimed at the delegation provision were that the district court should recognize the wholly groundless exception and decide gateway issues, and that the district court "should not delegate questions implicating its managerial discretion regarding the conduct of class actions." However, neither of these arguments is a specific challenge to the validity or enforceability of the delegation provision. Jones now asserts, for the first time on appeal, that "[t]he delegation clause itself was an unauthorized ex parte communication in violation of ethical rules and hence illegal." But Jones does not offer any details about why the delegation provision itself, apart from the agreement as a whole, was an ex parte communication and instead attacks the allegedly ex parte nature of the entire agreement, of which the delegation provision was one part. As we read this record, Jones did not directly challenge the delegation provision. Instead, the heart of his argumentation was directed at the agreement as a whole. But, even if we assume that Jones did specifically challenge the delegation provision, his challenge still would fail.

Among other things, Jones claims that the delegation provision is unconscionable. Under Georgia law, "the basic test for determining unconscionability is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are

10

so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract." NEC Techs., Inc. v. Nelson, 478 S.E.2d 769, 771 (Ga. 1996) (quotations omitted); accord Cappuccitti v. DirecTV, Inc., 623 F.3d 1118, 1124 (11th Cir. 2010). Other definitions of unconscionable agreements are those that "no sane man not acting under a delusion would make, and that no honest man would take advantage of," R.L. Kimsey Cotton Co. v. Ferguson, 214 S.E.2d 360, 363 (Ga. 1975) (quotations omitted); that are "abhorrent to good morals and conscience," F.N. Roberts Pest Control Co. v. McDonald, 208 S.E.2d 13, 15 (Ga. Ct. App. 1974); and in which "one of the parties takes a fraudulent advantage of another," id. (quotations and emphasis omitted).

Moreover, Georgia law divides unconscionability into procedural and substantive elements. "Procedural unconscionability addresses the process of making the contract, while substantive unconscionability looks to the contractual terms themselves." Jenkins, 400 F.3d at 875 (quoting NEC Techs., 478 S.E.2d at 771). To determine whether a contract is procedurally unconscionable, Georgia's courts consider various factors including, among others, "age, education, intelligence, business acumen and experience of parties, their relative bargaining power, the conspicuousness of and comprehensibility of the contract language, the oppressiveness of the terms, and the presence or absence of meaningful choice.'" Caley v. Gulfstream Aerospace Corp., 428 F.3d 1359, 1377 (11th Cir. 2005)

11

(quoting NEC Techs., 478 S.E.2d at 772).  To assess a claim of substantive unconscionability, Georgia's courts "have focused on matters such as the commercial reasonableness of the contract terms, the purpose and effect of the terms, the allocation of the risks between the parties, and similar public policy concerns."  NEC Techs., 478 S.E.2d at 772.

Jones alleges that the delegation provision was procedurally unconscionable because it was part of a contract of adhesion and because he had little bargaining power.  But "under Georgia law, an adhesion contract is not per se unconscionable."  In re Checking Account Overdraft Litig., 672 F.3d 1224, 1229 (11th Cir. 2012) (citing Crawford v. Results Oriented, Inc., 548 S.E.2d 342, 343 (Ga. 2001)).  In this case, it is true that Jones's business acumen and experience fell below that of his employer.  And while the bargaining positions of the two parties might have been unequal, the Supreme Court has recognized that unequal bargaining power is not enough to make arbitration agreements and their component provisions per se unenforceable.  See Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 33 (1991).  It is also essential to review the circumstances surrounding the making of the agreement and the language of the delegation provision.

For starters, the delegation provision in this case was written in clear, comprehensible terms and in readable type.  On his first day of work at the Kansas

12

City Waffle House, Jones was given at least three hours to read and sign his employment paperwork.  Most importantly, at the time he signed the agreement containing the delegation provision, Jones knew that he had a pending lawsuit against Waffle House.  Indeed, he was the only person present that day who was aware of this critical fact.  He did not inform the Kansas City Waffle House of his active litigation, nor did he tell his Florida class-action lawyers that he was seeking (and had gained) employment at another Waffle House establishment in another state.

Nor does Waffle House's practice of pre-signing the arbitration agreements make the delegation provision procedurally unconscionable.  The district court took issue with this practice, observing that "the whole process by which the waiver was obtained and then sought to be applied to this proceeding has an unsavory aroma."  But whether or not it was advisable for Waffle House's vice president to pre-sign the agreements, doing so was not "abhorrent to good morals and conscience," nor is there any evidence that Waffle House was seeking to take fraudulent advantage of Jones.  Again, the Kansas City Waffle House did not know that Jones was involved in a lawsuit against the corporation, and Jones did not offer that information to them.  Meanwhile, in Georgia, corporate Vice President Waller did not know until later that Jones had sought and gained employment with a Waffle House in Kansas City or that he had signed an arbitration agreement.

13

Under these circumstances, we cannot say that the mere fact of preprinting the agreements with Waller's signature already affixed transformed this unambiguous delegation provision into a procedurally unconscionable one. Nothing surrounding the delegation provision was procedurally unconscionable.

As for substantive unconscionability, Jones fares no better. The district court made no mention of substantive unconscionability in its order, focusing instead on facts that bear on procedural unconscionability, and Jones makes no mention of substantive unconscionability on appeal. But even if this argument is not waived, the record provides no evidence to support the claim. Jones's only claim of substantive unconscionability in the district court was that the delegation provision "terminate[d] [his] previously filed class action without explicitly saying so." However, the delegation provision does not, on its own, terminate Jones's class-action lawsuit. In any event, Jones agreed to the provision voluntarily without informing his class-action lawyers that he was doing so, and the Kansas City Waffle House had no knowledge that he was involved in a class-action suit against the corporation. In this situation, Jones had the upper hand.

Jones also makes no mention of any facts that would give rise to a finding of substantive unconscionability under Georgia law. He does not say that the delegation provision itself was commercially unreasonable; he does not challenge the purpose and effect of the provision's terms; he makes no mention of the

14

allocation of risk between the parties; and he raises no other public policy concerns specific to that provision.  See NEC Techs., 478 S.E.2d at 772.  The closest Jones comes to addressing these factors is found in his claim that "[i]t is simply not commercially reasonable to expect [him] to relinquish the vested right he has in this lawsuit."  But again, the delegation provision on its own does not extinguish Jones's class-action lawsuit, and even if it did, this Court has said that "arbitration agreements precluding class action relief are valid and enforceable."  Jenkins, 400 F.3d at 877.  Thus, because we can discern no unconscionability, we are required to enforce the delegation provision according to its terms.

III.

Since the delegation provision was valid, we must also decide whether the parties agreed to arbitrate gateway questions of arbitrability.  The Supreme Court has instructed us that "when courts decide whether a party has agreed that arbitrators should decide arbitrability," they "should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so."  First Options, 514 U.S. at 944 (quotations and alterations omitted); accord AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 649 (1986) ("[T]he question of arbitrability . . . is undeniably an issue for judicial determination.  Unless the parties clearly and unmistakably provide otherwise, the

15

question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator.").

In order to determine whether the parties have manifested a clear and unmistakable intent to arbitrate gateway issues, then, we look to the wording of the delegation provision itself.  We have found the requisite intent when the delegation provision at issue committed to arbitration "any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement," Parnell, 804 F.3d at 1148 (emphasis omitted); or, "any and all disputes arising out of or in connection with this Agreement, including any question regarding its existence, validity, or termination," Martinez, 744 F.3d at 1245; or, finally, "any issue regarding whether a particular dispute or controversy is . . . subject to arbitration," In re Checking Account Overdraft Litig., 674 F.3d 1252, 1255 (11th Cir. 2012) (alteration omitted).

In this case, the delegation provision says that

[t]he Arbitrator, and not any federal, state, or local court or agency, shall have authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement, including but not limited to any claim that all or any part of this Agreement is void or voidable.

This language clearly and unmistakably evinces the parties' intent to arbitrate all gateway issues.  The provision requires arbitration of "any dispute" relating to gateway issues, and as we have said, "[a]ny disputes means all disputes, because

16

'any' means all." Anders v. Hometown Mortg. Servs., Inc., 346 F.3d 1024, 1028 (11th Cir. 2003) (quotations omitted); see also United States v. Gonzales, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'") (quoting Webster's Third New International Dictionary 97 (1976)). The language is also strikingly similar to the language in Parnell and Martinez, which we have previously found to evince the requisite intent. See Parnell, 804 F.3d at 1148 (committing to arbitration "any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement") (other emphasis omitted); Martinez, 744 F.3d at 1245 (committing to arbitration "any question regarding [the agreement's] existence, validity, or termination") (quotations omitted and emphasis added).

In many of our sister circuits, a finding of a clear and unmistakable intent ends the analysis. See, e.g., Apollo Comput., Inc. v. Berg, 886 F.2d 469, 473 (1st Cir. 1989); VRG Linhas Aereas S.A. v. MatlinPatterson Glob. Opportunities Partners II L.P., 717 F.3d 322, 326 (2d Cir. 2013); Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union, 665 F.3d 96, 102 (4th Cir. 2012); Fallo v. High-Tech Inst., 559 F.3d 874, 877 (8th Cir. 2009); Momot v. Mastro, 652 F.3d 982, 988 (9th Cir. 2011); Chevron Corp. v. Ecuador, 795 F.3d 200, 207–08 (D.C. Cir. 2015). But in some circuits, the analysis proceeds one step further. Those courts -- the Fifth, Sixth, and Federal Circuits -- recognize what is called the

17

"wholly groundless" exception to an otherwise clear and unmistakable intent to

arbitrate gateway issues.  The Federal Circuit explained the modality this way:

> [T]he district court should first inquire as to who has the primary power to decide arbitrability under the parties' agreement.  If the court concludes that the parties did not clearly and unmistakably intend to delegate arbitrability decisions to an arbitrator, the general rule that the question of arbitrability is for judicial determination applies and the court should undertake a full arbitrability inquiry in order to be satisfied that the issue involved is referable to arbitration.  If, however, the court concludes that the parties to the agreement did clearly and unmistakably intend to delegate the power to decide arbitrability to an arbitrator, then the court should perform a second, more limited inquiry to determine whether the assertion of arbitrability is wholly groundless.  If the court finds that the assertion of arbitrability is not wholly groundless, then it should stay the trial of the action pending a ruling on arbitrability by an arbitrator.  If the district court finds that the assertion of arbitrability is wholly groundless, then it may . . . deny the moving party's request for a stay.

Qualcomm Inc. v. Nokia Corp., 466 F.3d 1366, 1371 (Fed. Cir. 2006) (quotations,

citations, and alterations omitted).  The Sixth Circuit adopted the same position in

Turi v. Main Street Adoption Services, LLP, 633 F.3d 496 (6th Cir. 2011), in

which it concluded that "even where the parties expressly delegate to the arbitrator

the authority to decide the arbitrability of the claims related to the parties'

arbitration agreement, this delegation applies only to claims that are at least

arguably covered by the agreement."  Id. at 511.  The Fifth Circuit has also

adopted the exception, concluding that "[t]he mere existence of a delegation

provision . . . cannot possibly bind [the plaintiff] to arbitrate gateway questions of

arbitrability in all future disputes with the other party, no matter their origin."

18

Douglas v. Regions Bank, 757 F.3d 460, 462 (5th Cir. 2014).  However, in dissent, Judge James L. Dennis noted that the wholly groundless exception "appears to be contrary to Supreme Court authority" and that he "d[id] not think the Supreme Court's decisions allow [ ] this innovation." Id. (Dennis, J., dissenting).

On the other side of the issue is the Tenth Circuit -- the only court to have expressly rejected the wholly groundless exception.  We agree that the wholly groundless exception has no place in this analysis.  The essential question is whether the parties clearly and unmistakably agreed to arbitrate gateway issues of arbitrability.  If they did, then the district court is required to give effect to that intent and must compel arbitration.

In Belnap v. Iasis Healthcare, 844 F.3d 1272 (10th Cir. 2017), the plaintiff sought to avoid arbitration and urged the court to adopt the wholly groundless exception. Id. at 1284–85.  After first concluding that the parties "clearly and unmistakably agreed to arbitrate arbitrability," the panel noted that the Supreme Court has not "spelled out the next steps for a court when it finds clear and unmistakable intent to arbitrate arbitrability." Id. at 1281, 1286.  After looking to Supreme Court precedent, Tenth Circuit precedent, and other appellate courts' decisions, the Tenth Circuit concluded that "courts in that situation must compel the arbitration of arbitrability issues in all instances in order to effectuate the parties' intent regarding arbitration." Id. at 1286.

19

In the Tenth Circuit's view, the wholly groundless exception is in tension with the Supreme Court's arbitration decisions -- "in particular, with the Court's express instruction that when parties have agreed to submit an issue to arbitration, courts must compel that issue to arbitration without regard to its merits." Id. Particularly relevant is the Supreme Court's instruction that

> in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the [ ] claim . . . is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator. The courts, therefore, have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim. The agreement is to submit all grievances to arbitration, not merely those which the court will deem meritorious.

Id. at 1286–87 (quoting AT&T Techs., 475 U.S. at 649–50) (quotations omitted). The Tenth Circuit took this instruction to heart, adding that "when parties agree to submit an issue to arbitration, courts are bound to effectuate the parties' intent by compelling arbitration -- no matter what the court thinks about the merits of the issue." Id. at 1287 (footnote omitted). It also observed that the delegation provision must be treated like any other provision in an arbitration agreement. Id. (citing Rent-A-Center, 561 U.S. at 70). The court thus declined to adopt the exception and instructed the district court to compel arbitration. Id. at 1292–93.

We join the Tenth Circuit in declining to adopt what has come to be known as the wholly groundless exception. The exception runs against the Supreme

20

Court's unambiguous instructions that lower courts may not "delve into the merits of the dispute." Douglas, 757 F.3d at 468 (Dennis, J., dissenting) (citing AT&T Techs., 475 U.S. at 649–50). Thus, for example, in United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564 (1960), the Supreme Court addressed whether a union member's claims fell within the scope of a collective-bargaining agreement, in which case the claims would have to be arbitrated. See id. at 564–65. The Court observed that the lower courts "have no business weighing the merits of the grievance, considering whether there is equity in a particular claim, or determining whether there is particular language in the written instrument which will support the claim." Id. at 568 (footnote omitted). In that case, the parties agreed "to submit all grievances to arbitration, not merely those which the court will deem meritorious." Id. Faced with clear language evincing the parties' intentions, the Court did not take even a "quick look" at the merits of the claims. The Supreme Court reaffirmed this approach in AT&T Technologies, emphasizing that

> in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. Whether "arguable" or not, indeed even if it appears to the court to be frivolous, the union's claim that the employer has violated the collective-bargaining agreement is to be decided, not by the court asked to order arbitration, but as the parties have agreed, by the arbitrator.

AT&T Techs., 475 U.S. at 649–50 (emphasis added).

21

While both United Steelworkers and AT&T Technologies addressed whether an underlying grievance -- rather than a gateway question -- was arbitrable, the Supreme Court has been clear that "[a]n agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." Rent-A-Center, 561 U.S. at 70. Thus, as the Tenth Circuit noted, "delegation provisions are as enforceable as any other provision in an arbitration agreement" and the parties' intent must be respected. Belnap, 844 F.3d at 1287 n.10. If the parties clearly and unmistakably intended to arbitrate all gateway issues, then all gateway issues -- regardless of how frivolous the court may deem them to be -- should be arbitrated. "[R]equir[ing] the courts to examine and, to a limited extent, construe the underlying agreement," InterDigital Commc'ns, LLC v. Int'l Trade Comm'n, 718 F.3d 1336, 1347 (Fed. Cir. 2013) (quotations omitted), vac'd on other grounds by 134 S. Ct. 1876 (2014), as the wholly groundless exception does, runs counter to the Supreme Court's mandate. Either the parties have evinced an intent to arbitrate gateway issues, or they have not. It's not for the courts to say the parties really didn't mean to do so in some circumstances, when the language they have employed allows for no such exceptions.

22

Moreover, this approach is altogether consonant with the FAA's "liberal federal policy favoring arbitration agreements." Moses H. Cone, 460 U.S. at 24. The "overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements according to their terms." AT&T Mobility, 563 U.S. at 344. Thus, "arbitration must be ordered 'even where the result would be the possibly inefficient maintenance of separate proceedings in different forums.'" Telecom Italia, SpA v. Wholesale Telecom Corp., 248 F.3d 1109, 1117 (11th Cir. 2001) (quoting Dean Witter Reynolds v. Byrd, 470 U.S. 213, 217 (1985)). Likewise, concerns about efficiency cannot justify adopting the wholly groundless exception. The FAA is focused on streamlining judicial -- not arbitral -- proceedings. See Ultracashmere House, Ltd. v. Meyer, 664 F.2d 1176, 1179 (11th Cir. 1981) (noting that the purpose of the FAA is "to relieve congestion in the courts and to provide parties with an alternative method for dispute resolution that would be speedier and less costly than litigation") (emphasis added), abrogated on other grounds by Moses H. Cone, 460 U.S. at 25. Moreover, even if we could examine the question of judicial economy, it's by no means clear that the courts would save time by initially deciding the gateway questions rather than referring them to the arbitrator for resolution. In sum, where the parties have unambiguously agreed to arbitrate gateway questions, they are entitled to have the arbitrator resolve those questions

23

regardless of any possible added time that might be spent at a separate arbitral proceeding.

In this case, the parties agreed to a delegation provision that unmistakably says that "[t]he Arbitrator, and not any federal, state, or local court or agency, shall have authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this Agreement, including but not limited to any claim that all or any part of this Agreement is void or voidable."  As we have noted already, this provision echoes other provisions that evinced a clear intent to arbitrate gateway issues.  See, e.g., Parnell, 804 F.3d at 1145, 1148 (committing to arbitration "any issue concerning the validity, enforceability, or scope of this loan or the Arbitration agreement") (emphasis omitted); Martinez, 744 F.3d at 1245 (committing to arbitration "any and all disputes arising out of or in connection with this Agreement, including any question regarding its existence, validity, or termination") (quotations omitted); In re Checking Account, 674 F.3d at 1255 (committing to arbitration "[a]ny issue regarding whether a particular dispute or controversy is . . . subject to arbitration").  In the face of the parties' agreement to arbitrate gateway issues concerning the interpretation, applicability, enforceability, and formation of the arbitration agreement at issue, the district court was not free to pass judgment on the wisdom or efficacy of the provision in the first instance and should have compelled arbitration.  Thus, we need not examine whether

24

Waffle House's arguments are wholly groundless and we conclude that all gateway issues of arbitrability must be sent to arbitration.[1]

## IV.

Jones invokes two other grounds for denying Waffle House's motion to compel arbitration: first, he claims that the motion to compel interferes with the district court's managerial authority over class actions; and, then he says that the arbitration agreement was an improper ex parte communication with a represented party. We remain unpersuaded.

## A.

In denying Waffle House's motion to compel arbitration, the district court alluded to its authority to control class-action communications. Class communications are generally governed by Federal Rule of Civil Procedure 23(d),

---

[1] However, even if we were to apply the wholly groundless exception, we would still conclude that Waffle House's arguments were not wholly groundless. Waffle House first claims that the arbitration agreement was enforceable because it was not an improper ex parte communication and did not interfere with the district court's managerial authority over class actions. Inasmuch as we agree with the position taken by Waffle House, see infra Part IV, Waffle House's arguments can hardly be characterized as wholly groundless.

Waffle House also says that Jones's FCRA claims are arbitrable because the agreement is broad enough to encompass the claims of a rejected applicant even when those claims predate the agreement. While this claim might not ultimately succeed, it is not wholly groundless. The scope of the agreement includes "all claims," "past, present, or future, arising out of any aspect of or pertaining in any way to" Jones's employment (emphasis added). This language is broad and could be read to include Jones's previous attempt at employment. And while there was no arbitration agreement in place at the time Jones's FCRA claims arose, the agreement includes "past" claims and we have previously allowed the arbitration of claims that arose prior to the execution of an arbitration agreement. See Belke v. Merrill Lynch, Pierce, Fenner & Smith, 693 F.2d 1023, 1028 (11th Cir. 1982), abrogated on other grounds by Dean Witter Reynolds, Inc., 470 U.S. at 217.

25

which says that in conducting a class action, the district court may issue orders that, inter alia, "impose conditions on the representative parties or on intervenors." Fed. R. Civ. P. 23(d)(1)(C).  While the district court did not expressly discuss Rule 23(d) in denying Waffle House's motion, it did liken this case to two cases in which this Court has condemned "unilateral, unsupervised communications with prospective class members."  One of those cases relied on Rule 23(d), while the other relied on a similar provision applicable to collective actions under the Fair Labor Standards Act.  In both cases, the defendants or their lawyers deliberately engaged in behavior aimed at convincing putative class members to give up their right to participate in a pending class action.  In Kleiner v. First National Bank of Atlanta, 751 F.2d 1193 (11th Cir. 1985), the defendant's counsel engaged in a solicitation campaign in which it called prospective class members to persuade them to opt out of the class.  See id. at 1197–98.  And in Billingsley v. Citi Trends, Inc., 560 F. App'x 914 (11th Cir. 2014), the defendant initiated in-person meetings with potential class members and had them sign arbitration agreements that made them ineligible to participate in the class action.  See id. at 917.  In both instances, this Court concluded that the district court had ample discretion to prohibit the communications in question.  See Kleiner, 751 F.2d at 1203; Billingsley, 560 F. App'x at 922.

26

In this case, however, unlike Kleiner and Billingsley, there is not the slimmest shred of evidence that the arbitration agreement was part of a purposeful attempt to communicate with putative class members, nor is there anything in this record even remotely suggesting that Waffle House contacted any putative class members and tried to get them to sign arbitration agreements.  Rather, it was Jones who initiated the communication with the defendant by seeking employment. Jones voluntarily applied for the Kansas City job without informing his attorneys and without telling his new employers about his pending lawsuit.  The Kansas City employees were not involved in the Florida class-action lawsuit, and Waffle House's central legal team in Georgia did not know that Jones had gained employment in Kansas City.  Nothing in this case implicates the concerns we have expressed about "[u]nsupervised, unilateral communications with the plaintiff class [that] sabotage the goal of informed consent."  Kleiner, 751 F.2d at 1203.  This arbitration agreement did not improperly interfere with the district court's managerial authority over class-action communications.

## B.

Jones also says that the district court properly denied the motion to compel arbitration because the agreement was an unauthorized ex parte communication in violation of Florida's ethical rules concerning the conduct of its attorneys.  This claim stemmed from the Waffle House practice of pre-signing the arbitration

27

agreements so that they are given to new employees with Waller's signature already affixed. Because Waller serves as both vice president and general counsel, Jones claims that the agreement offered to him amounted to an ex parte communication by a lawyer with a represented party in violation of Florida Bar Rule 4-4.2.

Rule 4-4.2 says that, "[i]n representing a client, a lawyer must not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer." Fla. Bar R. 4-4.2(a). Importantly, the rule "does not prohibit communication with a represented person, or an employee or agent of such a person, concerning matters outside the representation." Fla. Bar R. 4-4.2, cmt. Rule 4-4.2(a) also requires knowledge that the other party to the communication is represented by counsel in that matter: "[t]he prohibition on communications with a represented person only applies in circumstances where the lawyer knows that the person is in fact represented in the matter to be discussed." Fla. Bar R. 4-4.2, cmt. The lawyer must have "actual knowledge of the fact of the representation; but such actual knowledge may be inferred from the circumstances." Fla. Bar R. 4-4.2, cmt.

Here, the communication at issue -- the arbitration agreement -- did not mention the FCRA, Jones's FCRA claims, or Jones's ongoing lawsuit. There is

28

also no evidence that Waller, the lawyer purportedly involved in the communication, knew that the communication had been made to a party who was represented by counsel in an ongoing lawsuit, let alone that Jones had filed a class-action lawsuit in the Middle District of Florida. The agreement was given to Jones by the local management team in Kansas City without the participation or knowledge of Waffle House central management in Georgia. Although Waller acted as both vice president and general counsel, he signed the agreement in his capacity as vice president. Moreover, he has never been listed as counsel for Waffle House in Jones's FCRA lawsuit. The arbitration agreement did not amount to an improper ex parte communication, and the practice of pre-signing the agreements did not render the agreement invalid.

In short, because the arbitration agreement included a valid delegation provision that clearly and unmistakably evinced the parties' intent to arbitrate all gateway issues of arbitrability, Waffle House's motion to compel arbitration should have been granted. We, therefore, VACATE the district court's denial of the motion to compel and REMAND this case to the district court with instructions to compel arbitration.

VACATED and REMANDED.