IN THE UNITED STATES DISTRICT COURT 
 FOR THE MIDDLE DISTRICT OF ALABAMA 
 SOUTHERN DIVISION 

TERESA NEAL, ) 
 ) 
 Plaintiff, ) 
 ) 
v. ) CASE NO. 1:19-cv-647-RAH 
 ) 
GMRI, INC., et al., ) 
 ) 
 Defendants. ) 

 MEMORANDUM OPINION AND ORDER 

 I. Introduction 

 This is a sex discrimination and retaliation case arising out of Plaintiff Teresa 
Neal’s employment at GMRI, Inc., which does business as “Cheddar’s Scratch 
Kitchen” (CSK) in Dothan, Alabama. (Doc. 1, p. 1; Doc. 9-1, p. 2.) Neal has sued 
CSK and her former supervisor, Jamal Rowell, under federal and state law 
concerning the actions of Mr. Rowell. 
 Pending before the Court is the Defendants’ Motion to Compel Arbitration 
and Stay Proceedings. (Doc. 9.) Neal has filed a Response (Doc. 14) and the 
Defendants have filed a Reply (Doc. 17). The parties also have participated in oral 
argument. For the foregoing reasons, the Court will GRANT the Defendants’ 
motion. 

 II. Background 
 Neal began working at CSK as a line cook/culinary assistant in November 
2017 and reported to Jamal Rowel. (Doc. 1, p. 3; Doc. 9-1, p. 3.) Neal acknowledges 
that when she began her employment, she electronically executed various 

documents, including the “Cheddar’s Casual Café, Inc. Dispute Resolution Program 
and Mutual Agreement to Arbitrate Claims” (CCC agreement). (Doc. 9-1.) 
 Neal claims that, during the course of her employment, Rowell made 
continuous unwelcomed sexual comments to her. (Doc. 1, pp. 3-4.) Many of these 

comments were overheard by management at CSK, but nothing was done. (Doc. 1, 
p. 5.) In February 2018, Neal complained to front-office employee, Vickie Lott, 
about Mr. Rowell, but again, nothing was done to stop Rowell. (Doc. 1, p. 6.) 

 In May 2018, CSK posted a memo in the restaurant that notified employees 
of the new Darden Dispute Resolution Process (Darden DRP) that would become 
effective on June 8, 2018. (Doc. 9-1, p. 4; Doc. 17-1, p. 3.) CSK employees, 
including Neal, were told to log into the company computer and electronically 

acknowledge the new Darden DRP. (Doc. 9-1, p. 4.) Neal, however, did not do so. 
 On July 25, 2018, Neal’s company account was accessed using Neal’s 
personal log-in information. (Doc. 9-1, p. 5.) According to CSK, Neal herself 

logged into the computer using Neal’s own unique personal log-in information and 
“electronically acknowledged her receipt and reading of the DRP booklet.” (Doc. 
9-1, p. 5; Doc. 17-2, p. 3.) 
 Neal disputes this. (Doc. 1, p. 10.) As explained by Neal in her affidavit 
testimony, she “went into the office and Vicki [Lott] was at a table with a computer” 

and “already had something pulled up on the screen.” (Doc. 14-2, p. 2.) Neal further 
testified that Lott “stood over [her] with her hand on the mouse, and quickly clicked 
through a bunch of screens on the computer” so quickly that Neal could not read 

what was on the screens. (Doc. 14-2, pp. 2-3.) Neal was “not actually allowed to 
read what was on the computer screen as [Lott] just clicked through all of the 
screens.” (Doc. 1, p. 10.) When Neal asked Lott what was showing on the screens, 
Lott responded by saying that it was something that everyone had to do. (Doc. 14-

2, p. 3.) One of the documents purportedly shown on the screen was the Darden 
DRP. (Doc. 9-1, pp. 31-48.) 
 Neal filed this lawsuit on September 6, 2019 against CSK and Rowell, after 

she resigned because of the actions of Rowell. In response, CSK and Rowell moved 
to compel arbitration based upon arbitration agreements allegedly acknowledged by 
Neal during her employment at CSK, including the CCC agreement and the Darden 
DRP. 

 III. Relevant Legal Principles 
 “Under the FAA, parties cannot be forced to submit to arbitration if they have 

not agreed to do so.” Chambers v. Groome Transp. of Alabama, 41 F.Supp.3d 1327, 
1339 (M.D. Ala. 2014) (Watkins, J.) (quoting Chastain v. Robinson-Humphrey Co., 
957 F.2d 851, 854 (11th Cir. 1992)). A court must determine whether there is an 

agreement to arbitrate, which is generally a decision for the court and not an 
arbitrator unless the parties have expressly agreed otherwise. See Chambers, 41 
F.Supp.3d at 1335-1336 (discussing First Options of Chicago, Inc. v. Kaplan, 514 

U.S. 938, 944-45 (1995)). 
 A plaintiff, who challenges the existence of an arbitration agreement, also has 
the following burden: 
 [The Eleventh Circuit has] said that a party seeking to avoid arbitration 
 must unequivocally deny that an agreement to arbitrate was reached and 
 must offer some evidence to substantiate the denial. More specifically, 
 we require a party resisting arbitration to “substantiate[] the denial of 
 the contract with enough evidence to make the denial colorable.” Once 
 an agreement to arbitrate is thus put “in issue,” the Federal Arbitration 
 Act (FAA) requires the district court to “proceed summarily to the trial 
 thereof” and if the objecting party has not requested a jury trial, “the 
 court shall hear and determine such issue.” 9 U.S.C. § 4. 
Magnolia Capital Advisors, Inc. v. Bear Stearns & Co., 272 Fed. App’x 782, 785 
(11th Cir. 2008) (internal citations omitted). 
 The test to determine arbitrability and the allocation of the parties’ burdens is 
clear: 
 Section 2 [of the FAA] requires a two-pronged inquiry: first, whether 
 there is an arbitration agreement in writing; and second, if so, whether 
 the agreement is part of a transaction involving interstate commerce. 
 [The party seeking to compel arbitration] bears the burden of proving 
 both prongs. These prongs also are not resolved with the “thumb on 
 the scale in favor of arbitration because the federal policy favoring 
 arbitration does not apply to the determination of whether there is a 
 valid agreement to arbitrate between the parties. 
Chambers, 41 F.Supp.3d at 1338 (internal citations omitted). Moreover, courts must 
usually look to state law principles of contract formation to determine whether an 
agreement to arbitrate exists. See First Options of Chicago, Inc. v. Kaplan, 514 U.S. 

938, 944, 131 L. Ed. 2d 985 (1995); Chambers, 41 F.Supp.3d at 1342. 
 The Eleventh Circuit has countenanced the use of the summary judgment 
standard to resolve a motion to compel arbitration. See In re Checking Account 
Overdraft Litig., 754 F.3d 1290, 1294 (11th Cir. 2014)(describing an order 

compelling arbitration as “summary-judgment-like”; it is “in effect a summary 
disposition of the issue of whether or not there has been a meeting of the minds on 
the agreement to arbitrate”) (quoting Magnolia Capital Advisors, Inc. v. Bear 

Stearns & Co., 272 Fed. App’x. 782, 785-86 (11th Cir. 2008)(per curiam)). 

 IV. Discussion 

 In their motion, the Defendants argue that Neal is required to arbitrate her 
claims against them based upon two arbitration agreements (the CCC agreement and 
the Darden DRP) applicable to Neal’s employment with CSK. The CCC agreement 
was electronically acknowledged by Neal upon her employment with CSK, and Neal 
does not dispute that she is bound by that agreement. The Darden DRP also was 
electronically provided to Neal, but she disputes that she ever saw, read or 

acknowledged that agreement. The Court will begin its analysis of the Defendants’ 
motion by first considering the Darden DRP since, according to the Defendants, that 
agreement was intended to replace and supersede the CCC agreement. 

 As to the Darden DRP, the parties dispute whether that agreement was 
electronically acknowledged by Neal. Undoubtedly, a party can be bound by an 
electronically acknowledged arbitration agreement. See, e.g., Brueggemann v. 

NCOA Select, Inc., No. 08–80606–CIV, 2009 WL 1873651, at *2 (S.D. Fla. June 30, 
2009) (enforcing an online arbitration agreement contained within the terms and 
conditions of Overstock.com’s website, despite Plaintiff’s contention that he never 
saw or agreed to the terms and conditions, where “prior to entering the website, 

individuals [were] told, ‘[e]ntering this Site will constitute your acceptance of these 
terms and conditions. If you do not agree to abide by these terms, please do not enter 
the Site.’”); Melver v. Check ‘n Go of Florida, Inc., No. 13-20528-CIV, 2013 WL 

12148376 (S.D. Fla. July 22, 2013). 
 Since a party can be bound by an electronic acknowledgement, the question 
becomes whether Neal did so, because it is axiomatic that “parties cannot be forced 
to submit to arbitration if they have not agreed to do so.” Chastain, 957 F.2d at 854. 

Under current Eleventh Circuit precedent, in order for the Court to enforce the 
arbitration agreement, the Court must apply the “summary judgment-like standard,” 
and “may conclude as a matter of law that parties did or did not enter into an 

arbitration agreement only if there is no genuine dispute as to any material fact 
concerning the formation of such an agreement.” Bazemore v. Jefferson Capital Sys., 
LLC, 827 F.3d 1325, 1333 (11th Cir. 2016). 

 Here, the Defendants have not met their summary-judgment-like burden as it 
concerns the Darden DRP. “Giving Plaintiff the benefit of all reasonable doubts and 
inferences, material fact issues surrounding contract formation preclude the Court 

from deciding as a matter of law that the parties did or did not enter into the 
agreement to arbitrate.” Regan v. Stored Value Cards, Inc., 85 F.Supp.3d 1357, 1364 
(N.D. Ga. 2015) (internal citation omitted). 
 If the Darden DRP was the only arbitration agreement presented to the Court 

for enforcement, the Court’s inquiry would end there and the parties’ next step would 
be to participate in a trial on the issue of Neal’s assent to the Darden DRP. However, 
the Court’s inquiry does not end there because the Defendants also seek enforcement 

of the CCC agreement. 
 But before considering the Defendants’ ability to enforce the CCC agreement, 
the Court first must determine whether it is permitted to do so because, as counsel 
for the Defendants stated at oral argument, the Darden DRP was intended to replace 

and supersede the CCC agreement. If it does supersede the CCC agreement, then 
the Court must resolve the issue of the Darden DRP’s enforceability first because 
the CCC agreement otherwise would be unenforceable. 

 Resolution of the issue lies largely within the language of the Darden DRP 
and whether the Darden DRP contains language suggesting that the Darden DRP 
was intended to be a novation or substituted contract for the CCC agreement. See 

generally Safeco Insurance Co. v. Graybar Electric Co., 59 So. 3d 649, 656 (Ala. 
2010)(identifying the elements of a novation or substituted contract); Dasher v. RBC 
Bank, 745 F.3d 1111 (11th Cir. 2014)(analyzing whether an arbitration agreement 

had been superseded and replaced in total when the parties subsequently executed a 
new account agreement); Pittman v. Santander Consumer USA, No. 2:14-CV-87, 
2014 WL 1652376 (M.D. Ala. April 24, 2014)(explaining Alabama law and 
concluding that a subsequent contract did not supersede a prior contract that 

contained an arbitration clause). 
 Here, the Court has reviewed the Darden DRP and cannot locate any language 
stating the Darden DRP was intended to supersede the CCC agreement or that the 

Darden DRP constituted a novation of the CCC agreement. As such, the Court 
concludes that it can consider the CCC agreement without first having to determine 
whether the Darden DRP is enforceable1 and, in particular, without first having to 
conduct a trial on the making of the Darden DRP. 

 Unlike the Darden DRP, as to the CCC agreement, the parties do not dispute 

1 That the Darden DRP may have been posted within the restaurant for all to see, a 
point which Neal does not dispute, does not mean the Darden DRP is binding on 
Neal. See, e.g., Payne v. WBY, Inc., 141 F. Supp. 3d 1344, 1350 (N.D. Ga. 2015); 
Valente v. International Follies, Inc., No. 1:15-CV-02477, 2016 WL 3128528, at *3 
(N.D. Ga. January 6, 2016). 
its validity. They do, however, dispute its application to the parties in this case. The 
Defendants argue the scope of the CCC agreement encompasses Neal’s claims 

against them. Neal disputes this, and points to the language of the CCC agreement 
which limits its application to “Cheddars Casual Café, Inc.” only: 
 In recognition of the fact that, from time to time, differences may arise 
 between Cheddar’s Casual Café, Inc. (referred to below as the 
 “Company” or “Cheddar’s”) and its employees during, or after, each 
 employee’s employment, the Company has instituted a Dispute 
 Resolution Program and Mutual Agreement to Arbitrate Claims 
 (“Agreement”)…. 

1. Mutual Agreement to Resolve Disputes Through Arbitration 

 This Agreement is mutual, covering all claims that each Employee may 
 have against the Company or that the Company may have against an 
 Employee. All references to “Employee” include each employee or 
 successor, estate, or any other person or entity claiming by or through 
 the Employee. 

2. Claims Covered by this Agreement 

 The Company and the Employee consent to the resolution by arbitration 
 of all claims or controversies involving Employee’s application with, 
 employment with, or termination from, the Company. 

 The Claims covered by this Agreement include, but are not limited to, 
 claims for . . . personal injury and employment related tort claims. . . 
 claims for discrimination, retaliation, or harassment of any kind, 
 including without limitation harassment or discrimination based on 
 gender. . . . 

(Doc. 9-1, p. 20.) 

 Neal argues this language does not encompass her claims in this case because 
her employer was GMRI, Inc., not Cheddar’s Casual Café, Inc., and because she is 
not suing Cheddar’s Casual Café, Inc. More importantly, Neal notes the CCC 
agreement does not include broad language expanding its application to successors, 

affiliates, predecessors, agents, representatives, or employees. 
 For its part, GMRI, Inc. argues that, while the CCC agreement does not 
contain expansive language, GMRI, Inc. nevertheless comes within the CCC 

agreement’s scope because GMRI, Inc. was Neal’s employer, GMRI, Inc. is a 
wholly owned subsidiary of CCC, and the CCC agreement was intended to include 
employment claims against Neal’s employer and any affiliated persons and entities. 
Rowell makes a similar argument and contends that he, too, is afforded the benefits 

of the CCC agreement. Undoubtedly, if the CCC agreement applies to Neal’s 
employment claims against GMRI, Inc. and Rowell, then Neal must arbitrate her 
claims. 

 In reading the CCC agreement, the Court notes the agreement contains a 
delegation clause that provides, in pertinent part, that the “arbitrator has the 
exclusive authority to resolve any dispute relating to the applicability or 
enforceability of the Agreement.” (Doc. 9-1, p. 23.) See Jones v. Waffle House, 

Inc., 866 F.3d 1257, 1264 (11th Cir. 2017)(upholding “delegation provision” in an 
arbitration agreement in which the parties had “agree[d] to arbitrate gateway 
questions of arbitrability including the enforceability, scope, applicability, and 

interpretation of the arbitration agreement”). Once there is a delegation clause, “a 
court possesses no power to decide the arbitrability issue. That is true even if the 
court thinks that the argument that the arbitration agreement applies to a particular 

dispute is wholly groundless.” Henry Schein, Inc. v. Archer & White Sales, Inc., __ 
U.S.__, 139 S.Ct. 524, 529, 202 L.Ed. 2d 480 (2019). 
 The dispute between Neal and the Defendants concerning the application and 

scope of the CCC agreement to the Defendants is a dispute of arbitrability that must 
be submitted to the arbitrator for resolution. See, e.g., Riversa v. L-3 
Communications Corp., No. 8:09-cv-02447, 2010 WL 11629016, at *2 (M.D. Fla. 
May 24, 2010)(concluding that whether nonsignatory affiliates “are ultimately 

entitled to enforce the arbitration clause is a matter of the agreement’s continued 
existence, validity, and scope which must be decided by the arbitrator”); Contec 
Corporation v. Remote Solution Co., Ltd., 398 F.3d 205 (2d Cir. 2005)(concluding 

that signatory to an arbitration agreement must arbitrate dispute against nonsignatory 
because issue of arbitrability itself is subject to a decision by the arbitrator); 
Brittaniana-U Nigeria Ltd. v. Chevron USA, Inc., 866 F.3d 709, 715 (5th Cir. 2017); 
DeAngelis v. Icon Entertainment Group, 364 F.Supp.3d 787, 797 (S.D. Ohio 

2019)(“Whether a nonsignatory can enforce the arbitration agreement is a question 
of the enforceability of the arbitration clause, as to that defendant.”). See also 
Wiggins v. Warren Averett LLC, [Ms. 1170943, Feb. 7, 2020] __ So. 3d __, 2020 

WL 597293 (Ala. 2020) (concluding that dispute as to scope and application of 
arbitration agreement was for the arbitrator to resolve). 

 V. Conclusion 

 Accordingly, the Court concludes the CCC agreement contains a valid 
delegation clause that requires the arbitrator resolve all disputed issues as to 
arbitrability, including the applicability and enforceability of the CCC agreement to 
the Defendants. Based on the foregoing, it is ORDERED and ADJUDGED that 
the Defendants’ Motion to Compel Arbitration and Stay Proceedings is GRANTED. 

 It is further ORDERED and ADJUDGED that this case shall be STAYED 
and closed for administrative purposes. Within fourteen (14) days after the 
arbitration proceedings are concluded, the parties must file a status report with the 

Court. Also, the parties must file a status report 180 days from the date of this order. 
 DONE, this 11th day of February, 2020. 

 /s/ R. Austin Huffaker, Jr. 
 R. AUSTIN HUFFAKER, JR. 
 UNITED STATES DISTRICT JUDGE